**Sandra D. RILEY, Plaintiff–Appellee,**

v.

**Larue T. CAMP, Lori Winkler, f.k.a. Lori Webb, Defendants–Appellants.**

No. 94–9118.

United States Court of Appeals, Eleventh Circuit.

Dec. 8, 1997.

Kathryn Lloyd Allen and William C. Joy, Asst. Attys. Gen., Atlanta, GA, for Defendants–Appellants.

David Jewett Llewellyn, Llewellyn & Swanson, Atlanta, GA, Salvatore J. Serio, Bryant, Miller, Olive, Dawkins & Serio, Conyers, GA, for Plaintiff–Appellee.

ON PETITION FOR REHEARING EN BANC

(Opinion April 26, 1996, 11th Cir., Unpublished).

Before HATCHETT, Chief Judge, and TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35–5), the Suggestion of Rehearing En Banc is DENIED.

TJOFLAT, Circuit Judge, dissenting from the denial of rehearing en banc:

A social worker removed a fifteen-year-old child from the custody of her mother following allegations that the child was being abused. While in the custody of the state, the child became pregnant by her eighteen-

year-old boyfriend, whom she then married. The child's mother brought suit against the social worker and her immediate superior, alleging that they violated her own rights under the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment. The two social workers moved for summary judgment on the ground that the constitutional rights asserted by the mother were not clearly established when they took custody of the child, and, therefore, that they were entitled to qualified immunity. The district court denied their motion for summary judgment, and, on interlocutory appeal, a panel of this court affirmed that denial without an opinion.

After trial, a jury found for the mother and against the social workers in the amount of $600,000. On appeal, a divided panel of this court affirmed the district court's judgment in full. The panel held, *inter alia,* that the social workers deprived the mother of her rights under the substantive component of the Due Process Clause by failing to allow the mother to visit her child and by failing to prevent the child from becoming pregnant. The panel's creation of these new rights conflicts with circuit and Supreme Court precedent. The panel also held that the doctrine of law of the case prevented it from reconsidering the social workers' defense of qualified immunity. This holding also conflicts with circuit and Supreme Court precedent.

I asked that the court be polled for rehearing en banc, not only because the panel's decision is "in direct conflict with precedent of the Supreme Court [and] this Circuit," 11th Cir. R. 35–3, but also because the case involves "a question of exceptional importance," Fed. R. App. P. 35(a). The new rights the panel has created in this case will chill the investigation of child abuse in this circuit. Moreover, the panel's novel application of the doctrine of law of the case drastically undermines the important defense of qualified immunity, which shields many public employees, including social workers, from the expense of unwarranted litigation. Today the court refuses to rehear the case en banc. Because the court's decision not to rehear this case carries grave implications for the law of this circuit, I dissent.

## I.

### A.

On March 15, 1988, Rena Landress, then fifteen years old, was living with her mother, plaintiff Sandra D. Riley, in Shady Dale, Georgia. On the evening of March 15, unbeknownst to the plaintiff and contrary to her instructions, Rena went on a date with Billy Westbrook, her eighteen-year-old boyfriend. When Rena returned home, the plaintiff punished her by hitting her on her buttocks and legs four to six times with a one-inch-wide, doubled-over leather belt.

Six days later, on March 21, defendant Lori Winkler, a case worker at the Jasper County Department of Family and Child Services ("DFACS") in Monticello, received an anonymous phone call suggesting that the plaintiff was abusing Rena. Winkler investigated the allegations by speaking with Billy's mother, Louise Westbrook, by interviewing Rena at school, and by attempting unsuccessfully to contact the plaintiff.

On the following morning, March 22, Rena and Billy came to see Winkler. Rena said that she did not want to remain in the plaintiff's home. Winkler decided to take Rena into the custody of DFACS for the time being.[1] First, however, Winkler sent Rena and Billy back to school. Later that day, Winkler went with a sheriff's deputy to collect Rena's belongings from the plaintiff's home. Then, after school, a DFACS worker drove Rena to the home of Mr. and Mrs. Lewis, whose daughter was a close friend of Rena.

On March 24, less than two days later, a detention hearing regarding Rena was held before a Georgia Superior Court Judge, sitting pursuant to his power to hear juvenile matters under O.C.G.A. § 15–11–21(c)(3) (1994). The plaintiff attended this hearing

---

1. The parties disputed whether Winkler obtained judicial authorization to take Rena into custody before an unidentified DFACS worker picked her up from school. The jury found that Winkler did not, so I assume, for purposes of discussion, that the plaintiff did not receive a hearing before DFACS took custody of Rena.

and was represented by counsel, who briefly cross-examined Winkler, the only witness called to testify. At the conclusion of the hearing, the presiding judge signed a detention order continuing DFACS' detention of Rena. *See generally* O.C.G.A. § 15–11–18(4) (1994) (authorizing such orders).

On March 29, DFACS petitioned the Jasper County Juvenile Court for permanent custody of Rena. The same day, a hearing on the petition was scheduled for April 12. The hearing was subsequently continued to April 26, apparently to enable the plaintiff to obtain substitute counsel. At the April 26 hearing, the judge again continued the proceedings until an unspecified date so that the plaintiff could undergo a psychiatric evaluation, to which she had consented.

On June 6, before a hearing on DFACS' petition for permanent custody could be rescheduled, Rena and Billy told Winkler that Rena was pregnant and that they planned to marry. They in fact married four days later. Marriage emancipated Rena from the custody of both the plaintiff and DFACS. *See generally McGregor v. McGregor*, 237 Ga. 57, 226 S.E.2d 591, 592 (1976). Therefore, on June 13, 1988, DFACS moved the court to dismiss its petition for custody, and the court granted the motion on June 15. On March 21, 1990, the plaintiff brought this action.[2]

The complaint named as defendants Winkler and her immediate superior at DFACS, Larue T. Camp. The plaintiff sought, in three counts, compensatory and punitive damages. The first two counts sought recovery under 42 U.S.C. § 1983 (1994) for constitutional violations based on the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment; the third count was based on Georgia tort law.

The defendants' answer denied the plaintiff's allegations of wrongdoing and asserted, as an affirmative defense, that they were entitled to qualified immunity. Following some discovery, the defendants moved for summary judgment on their qualified immunity defense. The district court, however, denied the motion simply because "genuine issues of material fact remain in the case."

The defendants appealed, contending *inter alia* that the district court erred in concluding that they were not entitled to qualified immunity. The court affirmed the district court's denial of summary judgment without an opinion under 11th Circuit Rule 36–1.[3] *See Riley v. Camp*, 990 F.2d 1268 (11th Cir.1993) (unpublished table decision) [hereinafter *Riley I* ].

Following this decision, the case went to trial before a jury. At the close of the evidence, the defendants moved for judgment as a matter of law. The district court reserved ruling on this motion pending the return of the jury's verdict. The district court then submitted all three of the plaintiff's claims to the jury using special interrogatories instead of instructions. The jury answered the interrogatories in favor of the plaintiff and awarded her compensatory damages against both defendants, jointly and

---

**2.** Judge Birch's recitation of the foregoing facts makes much of the possibility that Winkler and Camp might have removed Rena from the Riley home for improper purposes, perhaps at Westbrook's urging. That the officials might have acted in bad faith is, however, irrelevant to the qualified immunity inquiry. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (expressly discarding subjective component of test for qualified immunity); *Foy v. Holston*, 94 F.3d 1528, 1536 (11th Cir.1996) ("[G]iven the circumstances and the state of the law, a reasonable child custody worker could have considered Defendants' conduct arguably proper even if Defendants were motivated in substantial part by unlawful motives."). I also fail to see how the officials' bad faith alone could confer substantive due process rights upon Riley.

**3.** This rule provides as follows:

When the court determines that any of the following circumstances exist:
(a) the judgment of the district court is based on findings of fact that are not clearly erroneous;
(b) the evidence in support of a jury verdict is sufficient;
(c) the order of an administrative agency is supported by substantial evidence on the record as a whole;
(d) a summary judgment, directed verdict, or judgment on the pleadings is supported by the record;
(e) the judgment has been entered without a reversible error of law;
and an opinion would have no precedential value, the judgment or order may be affirmed or enforced without opinion.
11th Cir. R. 36–1.

severally, in the amount of $100,000, and punitive damages against each defendant severally in the amount of $250,000—for a grand total of $600,000. The jury did not differentiate among the three claims, nor did the court's judgment. Hence, the judgment awarded the plaintiff $600,000 on each of her claims. After the court denied the defendants' renewed motion for judgment as a matter of law, the defendants took the current appeal.[4]

## B.

The *Riley II* panel affirmed the judgment of the district court.[5] After briefly summarizing the facts, the *Riley II* panel examined the substantive due process rights asserted by the plaintiff. The panel described these rights using the jury's answers to the special interrogatories. According to the panel, the jury found that Winkler, through "gross negligence, deliberate indifference, or specific intent," denied Riley her right to visit Rena, "even though [Riley's] residual parental rights had not been terminated by a court of competent jurisdiction." *Post* at 978. In addition, the panel noted, the jury found that both Winkler and Camp

> by deliberate indifference, gross negligence, or intentional misconduct failed in their duty to supervise or care for … Rena … while she was in [their] custody,

which resulted in the child becoming pregnant and marrying while in [their] care, thus permanently depriving [Riley] of her liberty interest in the care, custody, control, society and services of her child.

*Id.* Although the panel opinion did not discuss the finding in its opinion, the jury also found that the defendants' conduct, both in denying visitation to the plaintiff and in allowing Rena to become pregnant, "shock[ed] the conscience or offend[ed] the standards of decency and fairness which express the notions of justice of English speaking peoples." Based solely on the jury's findings—and without any citation of legal authority—the *Riley II* panel concluded that Riley had stated two claims under the substantive component of the Due Process Clause. The *Riley II* panel found that the plaintiff stated a claim under the procedural component of the Clause as well.[6]

Turning to the defendants' claim of qualified immunity, the *Riley II* panel held that the law of the case doctrine barred reconsideration of this defense. *See id.* at 968. As noted above, the defendants originally moved for summary judgment based on qualified immunity. The district court denied this motion, and the *Riley I* panel affirmed without opinion. The *Riley II* panel concluded from this procedural history that the *Riley I* panel must have already decided that the defen-

---

4. I refer to the current appeal hereinafter as *Riley II.*

5. The panel decided not to publish its opinion. *See generally* 11th Cir. R. 36–2 ("An opinion shall be unpublished unless a majority of the panel decides to publish it."); 11th Cir. I.O.P. 36–5 ("Opinions that the panel believes to have no precedential value are not published."). Nevertheless, I append a copy of the panel's unpublished opinion for three reasons. First, the panel's opinion is not secret: copies of the opinion are already available to the public at the Office of the Clerk of the Court of Appeals for the Eleventh Circuit in Atlanta, Georgia. In fact, I would imagine that the Georgia Attorney General, who wrote the briefs for the defendants in this case, has already informed the state agencies that deal with the juvenile justice system about this case. The plaintiffs' bar cannot be far behind. Second, it is difficult to write a persuasive dissent when the reader cannot see the subject of the dissent. Third, and most importantly, unpublished opin-

ions are "persuasive authority" in this circuit. *See* 11th Cir. R. 36–2. From the litigant's perspective, the only difference between a published opinion and an unpublished opinion is that a subsequent panel can overrule an unpublished opinion.

6. The *Riley II* panel framed the plaintiff's procedural due process claim as follows:

> [T]he jury found in its special interrogatories that Camp and Winkler "had not obtained approval by a judge before taking … Rena … into custody," and that, at the time that Rena was taken into custody, no emergency situation existed which threatened Rena's health or welfare. The jury also found that deprivation notice and a hearing for Riley were feasible before … DFACS took Rena into protective custody.

*Post* at 978 (citation omitted). The panel found that these jury findings stated a claim for a denial of procedural due process.

dants were not entitled to qualified immunity. *See post,* at 979 & n. 6.

Consequently, the *Riley II* panel applied the doctrine of law of the case to the *Riley I* decision and rejected the defendants' second assertion of qualified immunity. The *Riley II* panel quoted the definition of the law of the case doctrine contained in *United States v. Robinson,* 690 F.2d 869 (11th Cir.1982): "Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case." *Id.* at 872. The *Riley II* panel then applied this doctrine to the defendants' appeal of the qualified immunity issue and affirmed the judgment of the district court in full.

Judge Kravitch concurred in the majority's discussion of substantive due process and the law of the case doctrine. *See post* at 980 (Kravitch, J., concurring in part and dissenting in part). According to Judge Kravitch, "[i]f the facts presented by [a] plaintiff[ ] at the summary judgment stage become, without notable exception, the actual facts as developed at trial," then there is no need to review a prior denial of qualified immunity. *Id.* at 982. She found that several recent opinions of this court had expressed the view that "qualified immunity can be raised at trial even if [it is] initially denied at the summary judgment stage." *Id.* at 980 (citing *Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995); *Kelly v. Curtis,* 21 F.3d 1544, 1546 (11th Cir.1994); *Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1233 (11th Cir.1992); *Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1579 n. 8 (11th Cir.1992) (Edmondson, J., dissenting), *vacated,* 982 F.2d 472, *dissenting opinion adopted,* 998 F.2d 923, 923 (1993) (en banc)). Judge Kravitch, however, characterized this discussion as non-binding dicta. *See post* at 980.

Judge Kravitch also noted that the Supreme Court had recently held that "defendants can appeal from a denial of qualified immunity at both the motion to dismiss stage

as well as the summary judgment stage because 'resolution of the immunity question may require more than one judiciously timed appeal.'" *Post* at 981 n. 2 (quoting *Behrens v. Pelletier,* 516 U.S. 299, ——, 116 S.Ct. 834, 840, 133 L.Ed.2d 773 (1996) (internal quotation marks omitted)). According to Judge Kravitch, *Behrens* held that "the law of the case doctrine would not normally bar revisiting the qualified immunity issue at summary judgment where an appellate court previously had ruled on an appeal from the motion to dismiss." *Id.* In spite of this language, however, she concurred in the application of the law of the case doctrine because it would "promot[e] finality" and "avoid waste of judicial resources." *Id.* at 981.

Judge Kravitch then considered whether an intervening change in the law between the *Riley I* decision and the *Riley II* appeal prevented the application of the law of the case doctrine. She cited two intervening en banc decisions of this court dealing with the creation of rights under the substantive component of the due process clause, *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (en banc), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), and *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146 (11th Cir.1994) (en banc). *See id.* at 982 n.4. She stated, however, that "neither of these developments ... can be described as 'a contrary decision of law applicable to this case.'" *Id.*

Finally, Judge Kravitch called attention to our prior panel rule: "This circuit follows a strict policy of following prior panel opinions unless such are overruled by the court sitting en banc." *Id.* at 982. Based on this rule, she concluded that a panel must follow a prior panel's denial of qualified immunity, "except in the rarest cases"—except where obedience to a clearly erroneous prior panel ruling would work a manifest injustice. *Id.* Judge Kravitch therefore concurred in the panel's application of the law of the case doctrine to foreclose the defendants' claim of qualified immunity.[7]

---

**7.** Judge Kravitch dissented from the portion of the *Riley II* opinion that affirmed the damages award. She did not believe that the evidence

supported a finding of reckless indifference or "evil motive" sufficient to justify the award of $500,000 in punitive damages. *See post* at 983.

## II.

*Riley II* broke with circuit and Supreme Court precedent in two main respects. First, *Riley II* created two new substantive due process rights. These two new rights conflicted with our precedent in their scope and in the method of their creation. Second, *Riley II* wrongly applied the doctrine of law of the case to foreclose the defendants' second appeal from the denial of qualified immunity. The court's misapplication of this doctrine conflicts with a prior panel decision and will undercut the defense of qualified immunity in this circuit. I examine *Riley II*'s mistakes to demonstrate why this case merits rehearing en banc.

### A.

*Riley II*'s creation of two new substantive due process rights conflicts with established circuit and Supreme Court precedent. "As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Not only did the *Riley II* panel "break new ground in this field" without the "utmost care" required by "judicial self-restraint," *id.,* but it also did so without a careful examination of the allegations to determine exactly how the plaintiff described the substantive constitutional right at stake. *See Washington v. Glucksberg,* —— U.S. ——, ——, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997); *Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993).

In his opinion concurring in the court's decision to deny rehearing, Judge Birch asserts that the right at issue in this case is the "long-acknowledged right to family integrity." *Post,* at 986. Both the method used by the district court and a close analysis of the rights asserted by the plaintiff reveal, however, that the rights created were new and contravened Supreme Court and circuit precedent.

The method utilized by the district court, and subsequently endorsed in *Riley II,* to determine whether the plaintiff's substantive due process rights had been violated by the defendants demonstrates that the rights created were both new and not reflective of the type of principled extension of due process that "judicial self-restraint" envisions. In its special interrogatories to the jury, the district court improperly submitted legal questions to the jury.[8] The court asked:

> [D]o you find by a preponderance of the evidence that the conduct of the defendants who denied plaintiff visitation with her child shocks the conscience or offends those standards of decency and fairness which express the notions of justice of English speaking peoples?

and:

> Do you find by a preponderance of the evidence that the conduct of the defendants who demonstrated deliberate indifference, gross negligence, or intentional misconduct in caring for and supervising plaintiff's child while in the defendants' custody and control shocks the conscience or offends the standards of decency and fairness which express the notions of justice of English speaking peoples?

The term "shocks the conscience" comes from *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In *Rochin,* the Supreme Court held that the use of a stomach pump by police to extract evidence from an unwilling defendant was so shocking that the Due Process Clause of the Fourteenth Amendment barred a criminal conviction based on such evidence. *See id.* at 172, 72 S.Ct. at 209–10. Because the Fourth and Fifth Amendments had not yet been incorporated into Fourteenth Amendment jurispru-

---

**8.** It is fundamental that questions of law are not to be decided by juries.

dence,[9] and so were not yet enforceable against the states, the Court could not point to a specific constitutional provision violated by the forced extraction of evidence from the defendant's stomach. *See Mapp v. Ohio,* 367 U.S. 643, 663–65, 81 S.Ct. 1684, 1696–97, 6 L.Ed.2d 1081 (1961)(Black, J., concurring). Therefore, the Court created a *new right* under the substantive component of the Due Process Clause, delineating a practice in which the states could not engage. In effect, the Court interpreted the Due Process Clause to contain a new provision proscribing the forced extraction of evidence from a defendant's stomach.

By allowing the jury in this case to determine whether the defendants' conduct "shocked the conscience," the district court allowed the *jury* to create and define new due process rights under the Fourteenth Amendment. The appellants raised this issue on appeal, but the *Riley II* panel ignored their argument and did not address the issue of whether the defendants' conduct shocked the conscience. Instead, the panel simply found that the jury's findings were "supported by substantial evidence," and so affirmed the district court's ruling. *Ante* at 960. The panel did not even question whether the rights as defined by the jury were rights actually guaranteed by the substantive component of the due process clause. The panel's oversight is even more egregious considering that this circuit, sitting en banc, has specifically stated that "*Rochin* in no way created a substantive right on which claimants might claim civil damages," and therefore, "[t]he *Rochin* standard has no place in a

civil case for money damages." *McKinney,* 20 F.3d at 1556 n. 7.[10]

Notwithstanding the fact that the *Riley II* panel accepted without question the jury's definition of the plaintiff's substantive due process rights, Judge Birch maintains that the right at stake is a parent's established fundamental right to custody and control of her children. The right of parents to custody of their children and the right to raise them as they see fit are firmly established fundamental liberty interests. *See M.L.B. v. S.L.J.,* —— U.S. ——, ——, 117 S.Ct. 555, 564–65, 136 L.Ed.2d 473 (1996); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Equally firmly established, however, is the proposition that states may, in the exercise of their police power, remove children from the custody of their parents when the children's health, safety, or emotional welfare demands it. *See Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972) ("We do not question the assertion that neglectful parents may be separated from their children."); *Prince v. Massachusetts,* 321 U.S. 158, 166–67, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990); *cf. M.L.B. v. S.L.J.,* —— U.S. at ——, 117 S.Ct. at 570 (holding that Mississippi may not block indigent parent's access to appeal of parental termination when access is granted to those who can pay). In particular, a state may restrict an alleged child abuser's access to her child without breaching the requirements of substantive due process. *See Weller v. Depart-*

9. The Fourth Amendment was made enforceable against the states in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and the Fifth Amendment right to protection from compelled self-incrimination was made enforceable against the states in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

10. Although the term "shock the conscience" continues to appear in Supreme Court cases— almost invariably in the Court's recitation of the plaintiff's claim—it has not been used by that Court to create any new substantive rights. *See, e.g., Collins,* 503 U.S. at 128, 112 S.Ct. at 1070 (holding that city's failure to train or warn its employees about work hazards was not "con-

science shocking, in a constitutional sense"). In fact, now that many of the protections of the Bill of Rights have been incorporated into Fourteenth Amendment jurisprudence, the Court has limited the use of the nebulous standards of substantive due process, steering constitutional claims to more specific amendments. *See, e.g., Graham v. Connor,* 490 U.S. 386, 393–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989) (holding that damages claim for injuries sustained when officers used physical force during a stop should be analyzed under Fourth Amendment rather than substantive due process); *Whitley v. Albers,* 475 U.S. 312, 327 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (holding that substantive due process provides no greater protection to prisoner shot

*ment of Soc. Servs.,* 901 F.2d 387, 391–92 (4th Cir.1990); *Fitzgerald v. Williamson,* 787 F.2d 403, 407–08 (8th Cir.1986). Review of the plaintiff's allegations demonstrates that the right of a parent to custody and control of her child was neither at issue nor violated in this case.

First, the plaintiff did not allege that DFACS' initial removal of Rena from her custody constituted a violation of substantive due process.[11] Plaintiff alleged, and the jury and *Riley II* panel found, that the defendants' subsequent unilateral denial of visitation, through gross negligence, reckless indifference, or specific intent, constituted a violation of her right to substantive due process. The substantive component of the due process clause "forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno,* 507 U.S. at 302, 113 S.Ct. at 1447.

The right created by the jury and sanctioned by the *Riley II* panel is subject to two interpretations. It could be that a person has a fundamental liberty interest in visitation (as opposed to custody), until custody has been terminated by a court of competent jurisdiction. If plaintiff in fact had such a right—and it would still be a new right—then her claim would be that the defendants, through gross negligence, reckless indifference, or specific intent, exceeded the state's police power in denying plaintiff the fundamental right to visitation.[12] If the plaintiff actually had a substantive right to visitation, it could not have been violated here. The uncontroverted evidence that plaintiff hit Rena with a belt on the buttocks, coupled with the superior court judge's ruling at the March 24 detention hearing continuing

DFACS' custody of Rena, sufficiently demonstrate that defendants acted within the state's broad power to protect children from abuse. *Cf. Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) (stating that "[t]he Fourteenth Amendment does not protect against all deprivations of liberty" and noting that the distribution of duties in the criminal justice system does not require a sheriff holding a suspect in custody to "perform an error-free investigation," because ultimate determinations of innocence are left to judge and jury).

In the alternative, it may be that the jury felt that the right to visitation prior to a final determination on custody could not be denied "unilaterally." A claim that the process itself was deficient or unfair, however, would be brought under the procedural component of the Due Process Clause rather than the substantive component. A violation of procedural due process occurs "only when the state refuses to provide a process sufficient to remedy the procedural deprivation." *McKinney,* 20 F.3d at 1557. Georgia state law, however, provides a mechanism for enforcing a parent's right to visit her child—a mechanism which the plaintiff in fact eventually used to broaden her access to Rena.

Before the March 24 detention hearing, the superior court, pursuant to its power to hear juvenile matters, had jurisdiction to order the defendants to grant visitation rights to the plaintiff. *See* O.C.G.A. § 15–11–57(a)(2) (1994). The plaintiff did not ask the court to exercise this jurisdiction. When the superior court assumed jurisdiction over the matter at the March 24 hearing, it clearly had the authority, which the plaintiff again did not ask it to exercise, to alter the defendants' visitation decisions. *See* O.C.G.A. § 15–11–34(a) (1994). Even after the court gave DFACS temporary custody of Rena,

---

during a prison riot than does the Eighth Amendment).

**11.** If she had alleged that she was denied her fundamental right to custody and control of her child, then the panel's holding would have squarely conflicted with this court's holding in *Bendiburg,* 909 F.2d at 468 ("Since the government may intervene in the family relationship when following proper procedures upon appropriate facts, *Bendiburg* has no constitutional right

which can survive procedural due process."). The panel did not distinguish *Bendiburg* in its decision. In fact, it did not even cite the case. Even assuming that there was a substantive due process right to visitation, *Bendiburg* would pose a serious, if not insurmountable, obstacle to the plaintiff's first substantive due process claim.

**12.** Clearly it would be within the state's police power to deny visitation prior to the termination of custody if it were necessary to protect the health and well-being of the child.

the plaintiff was entitled under state law to a hearing on visitation. *See In re K.B.*, 188 Ga.App. 199, 201–02, 372 S.E.2d 476, 479 (1988). She did not ask for such a hearing, presumably because, according to the record, DFACS was allowing her to visit Rena on a weekly basis. Finally, at the April 26 permanent custody hearing, the court, at the plaintiff's request, instructed DFACS to schedule increased visitation between the plaintiff and Rena. Because the plaintiff could and eventually did obtain the relief she sought from the Georgia courts, she stated no claim under the procedural component of the Due Process Clause.

In addition, the *Riley II* panel found that the defendants infringed a second substantive due process right of the plaintiff's when they failed, by gross negligence, deliberate indifference, or specific intent, to prevent Billy Westbrook from impregnating and marrying Rena, the acts that resulted in the termination of the plaintiff's residual parental rights. The *Riley II* panel cited no legal authority for this substantive due process right, and I find no support for it in the case law.[13]

Parents have a fundamental liberty interest in the custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982). However, "nothing in the language of the Due Process Clause itself requires the State to protect the ... liberty ... of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). For example, social workers do not violate the substantive component of the Due Process Clause when they know of repeated instances of child abuse but fail to intervene, even when this failure results in permanent injury to the child. *See id.* at 197–98, 109 S.Ct. at 1004.

In the present case, Billy was a private actor. But for the participation of Billy, the alleged violation of the plaintiff's purported substantive due process right would not have occurred. In other words, a private, non-

state actor caused the termination of plaintiff's custody over her child. Therefore, the plaintiff has no cognizable right under the substantive component of the Due Process Clause. *See, e.g., Powell v. Georgia Dep't of Human Resources*, 114 F.3d 1074, 1079 (11th Cir.1997) (holding that social workers did not violate a noncustodial parent's clearly established substantive due process rights when they allowed his child to be returned to the custodial parent's household, where the child was abused and killed); *Wooten v. Campbell*, 49 F.3d 696, 700 (11th Cir.1995) (holding that social workers did not violate the substantive due process rights of a custodial parent and her child when they granted visitation privileges to the noncustodial parent, who subsequently abducted and murdered the child), *cert. denied*, —— U.S. ——, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995).

One might argue that the state, by virtue of its custodial authority over Rena, had a constitutional duty to protect Rena from Billy's violation of Georgia's statutory rape law. *See generally* O.C.G.A. § 16–6–3 (1996) (proscribing "sexual intercourse with any person under the age of 16 years and not his or her spouse"). The Supreme Court has suggested that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005. Along similar lines, in *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), this court stated that "the existence of a special relationship between an individual and the state may trigger a constitutional duty on the state's part to provide protective services." *Id.* at 352 (citation omitted). Because DFACS had a special, custodial relationship with Rena, the plaintiff could potentially argue that DFACS violated the substantive component of the Due Process Clause when it failed to protect Rena from Billy's unlawful activities.

---

13. Again, I note that the *Riley II* panel's holding on this point relied upon the *jury's* conclusion

that such rights exist.

In this case, however, the "special relationship" theory suffers from two fatal defects. First, the special relationship theory centers on a child's assertion of *her own substantive due process rights*—not a parent's assertion of some derivative entitlement based upon her residual custodial rights. *See Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (holding that a minor involuntarily committed to a state mental hospital "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests"); *Cornelius*, 880 F.2d at 352–53 ("Under the [special relationship] analysis, government officials may be held liable for the deprivation by a third party of a private citizen's due process rights when a special relationship is found to exist between the victim and the third party *or between the victim and the government officials*." (emphasis added) (citation omitted)). Even assuming that the special relationship theory applies, therefore, the plaintiff herself would not be entitled to sue on the basis of any alleged dereliction of that relationship.

Second, the special relationship theory only applies where a state limits the individual's freedom to act on his own behalf and then fails to provide for his basic human needs. *See DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005–06; *see, e.g., Wright v. Lovin*, 32 F.3d 538, 541 (11th Cir.1994) (stating that there can be no special relationship between the state and the victim if the state did not create the dangerous situation or render the victim more vulnerable to it). In this case, the state placed no restrictions on Rena's freedom to act on her own behalf. Not only did Rena engage in sexual intercourse voluntarily; she also did so outside the supervision and physical control of her foster parents. The *Riley II* panel erred in creating a substantive due process right that would allow noncustodial parents to sue the state whenever their child, while in foster care, becomes pregnant and marries without their blessing.

"The substantive component of the Due Process Clause protects only those rights which are fundamental." *Wooten*, 49 F.3d at 699 (citing *McKinney*, 20 F.3d at 1556). The rights created by the *Riley II* panel were not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Michael H. v. Gerald D.*, 491 U.S. 110, 122, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989) (Scalia, J.) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)) (internal quotation marks omitted). In sum, the *Riley II* panel ignored circuit and Supreme Court precedent by creating two new substantive due process rights that were not justified in law.[14]

## B.

The *Riley II* panel applied the doctrine of law of the case to foreclose the defendants' second appeal from the denial of qualified immunity. Under the doctrine of law of the case, "the trial court and appellate courts are bound by any findings of fact or conclusions of law made by the appellate court in a prior appeal of the case at issue." *United States v. Burns*, 662 F.2d 1378, 1384 (11th Cir.1981). This doctrine does not apply, however, when "(1) new and substantially different evidence material to the issue has been presented; (2) controlling authority has been rendered which is contrary to the law of the previous decision; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice if implemented." *Flint Elec. Membership Corp. v. Whitworth*, 68 F.3d 1309, 1312 (11th Cir.1995) (per curiam), *modified*, 77 F.3d 1321 (1996). The *Riley II* panel erred in applying the doctrine of law of the case because *all three* of the foregoing exceptions apply here.

---

**14.** I draw a similar conclusion about the plaintiff's alleged procedural due process right, which I discuss *supra*, note 6. Whether the circumstances in this case required notice and a predeprivation hearing was, and is, a close question. Hindsight may have revealed to the jury the practicality of predeprivation notice and an adjudicatory hearing. However, "a court may not find that the right was established through the use of hindsight." *Frazier v. Bailey*, 957 F.2d 920, 929 (1st Cir.1992) (citations omitted). I believe that, viewing the evidence in the light most favorable to the plaintiff, as of March 22, 1988, the law had not clearly established that the plaintiff was entitled to notice and a predeprivation hearing in this particular case.

First, the *Riley II* panel should have heard the defendants' appeal on its merits because the evidence at trial differed substantially from the evidence at summary judgment. Supreme Court and circuit precedent specifically envision this type of successive appeal in cases involving qualified immunity. Second, the *Riley II* panel could not apply the doctrine of law of the case to foreclose this appeal because an intervening decision, *McKinney v. Pate*, eliminated the due process claims asserted by the plaintiff. Third, the *Riley II* panel could not create law of the case out of *Riley I* because the *Riley I* panel erred as a matter of law, and the application of law of the case to the defendants' second appeal would work a manifest injustice. The rights allegedly infringed by the defendants in 1988 were first articulated by the jury at the trial of this case, and only thereafter endorsed by the *Riley II* panel in 1996. For these reasons, I believe that *Riley II* erred in holding that the law of the case doctrine foreclosed the defendants' second appeal from the denial of qualified immunity.[15]

## 1.

"[Q]ualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier,* —— U.S. ——, ——, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations and internal quotation marks omitted)). To assert qualified immunity from civil damages, defendants must show that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457 U.S.

800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Accordingly, when defendants move for summary judgment based on qualified immunity, a district court must determine whether the operative facts, viewed in a light favorable to the plaintiff, demonstrate that the defendants violated a legal right that was clearly established at the time of their conduct. *See Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

As litigation proceeds, the record grows and changes occur in the factual predicates for the legal determination of qualified immunity. We have therefore specifically held that defendants can raise the qualified immunity defense both *before* trial on a motion for summary judgment and then *after* trial on a motion for judgment as a matter of law. *See Cottrell v. Caldwell,* 85 F.3d 1480, 1487–88 (11th Cir.1996). On appeal, this court determines whether the operative facts—as developed at *each stage*—indicate that the defendants violated a clearly established constitutional right. In short, defendants can raise the defense of qualified immunity at successive stages during litigation. *See Behrens,* 516 U.S. at ——, 116 S.Ct. at 839; *see also Johnson v. Fankell,* —— U.S. ——, ——, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108 (1997) ("[I]f [qualified immunity] is found applicable *at any stage of the proceedings,* it determines the outcome of the litigation by shielding the official from damages liability." (emphasis added)).

The *Riley II* panel decided that the district court and the *Riley I* panel must have held that the operative facts, viewed in a light favorable to the plaintiff, raised the possibility of a violation of clearly established constitutional law. Even if the district court and the *Riley I* panel made this determination *at summary judgment,* however, our precedent requires that the *Riley II* panel reconsider

---

**15.** *Riley II* not only conflicts with our precedent; it also conflicts with itself. If the law of the case doctrine barred reconsideration of the defendants' claim of qualified immunity, as *Riley II* held, then the *Riley II* panel did not need to bother defining the due process rights described above in part II.A. Because qualified immunity was denied, the rights violated under the plaintiff's scenario must have been clearly established;

thus the law of the case doctrine would preclude reconsideration of those issues as well. It is ironic that the *Riley II* panel struggled in vain to articulate the precise contours of the plaintiff's nonexistent substantive due process rights while devoting no attention whatsoever to the defendants' meritorious assertion of qualified immunity.

the issue *after trial.* Our precedent requires this review because the record in this case changed between the time the district court considered the defendant's motion for summary judgment and the entry of final judgment, which means that the factual predicate for the legal determination of qualified immunity changed as well.

The trial in this case produced six volumes of testimony—some 1,384 pages of additional evidence—which the *Riley I* panel did not have before it. This trial testimony covered such issues as the existence *vel non* of an emergency which might have justified the defendants' actions in taking custody over Rena. The parties disputed this issue throughout the litigation. Moreover, even if the subject matter of this additional testimony coincided with that of the testimony before the *Riley I* panel, it differed in its essential nature. Lawyers usually depose witnesses before trial for discovery purposes. For example, unlike a lawyer engaging in direct examination at trial, a lawyer representing the party whose witnesses are called to the deposition rarely questions those witnesses (except perhaps to correct a misstatement by the witness). Thus, at trial, witnesses rarely repeat their deposition testimony verbatim. In addition, they often testify about matters not fully explored in their pretrial depositions. Sometimes they even retract pretrial testimony, even in the face of extensive cross-examination regarding their prior inconsistent statement. In short, trial testimony is inherently different from pretrial testimony.

The law of the case doctrine does not bar reconsideration of an issue when a subsequent trial produces substantially different evidence. *See United States v. Robinson,* 690 F.2d 869, 872–73 (11th Cir.1982). We should be particularly mindful of this exception in cases involving the issue of qualified immunity, because our precedent affords defendants multiple opportunities to raise this particular matter on appeal. Therefore, I believe that *Riley II* should have addressed the denial of qualified immunity a second time.

Judge Kravitch suggests in her separate *Riley II* opinion that the facts after trial must not have differed substantially from the operative facts at the summary judgment stage because the jury found for the plaintiff. *See post* at 981–82. If law of the case bars reconsideration of the qualified immunity defense whenever the plaintiff wins at trial, however, then courts of appeals would *never* need to reconsider the qualified immunity defense as directed by the Supreme Court in *Behrens* and our own court in *Cottrell.* We would only have occasion to reconsider the qualified immunity defense when the jury found for the defendants—meaning never. The question is not whether the jury believed the plaintiff's allegations. Rather, the question is whether the evidence at summary judgment, viewed *by the court* in a light favorable to the plaintiff, was different from the evidence presented at trial, viewed in a light favorable to the plaintiff. Substantial differences between the record on appeal in *Riley I* and the record on appeal in *Riley II* precluded the application of the law of the case doctrine.

#### 2.

The law of the case doctrine does not apply where an intervening change in the controlling law dictates a different result. *See Piambino v. Bailey,* 757 F.2d 1112, 1120 (11th Cir.1985). According to *Riley II, Riley I* created law of the case when it implicitly found that the operative facts, viewed in a light favorable to the plaintiff, demonstrated that the defendants' conduct violated clearly established constitutional rights. The *Riley I* panel issued its affirmance in 1993. The *Riley II* panel rendered its decision in 1996.

In 1994, however, between *Riley I* and *Riley II,* this court decided *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (en banc), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). *McKinney* held that "[a] violation of a substantive due process right ... is complete when it occurs.... Because the right is 'fundamental,' no amount of process can justify its infringement." *Id.* at 1556–57. As I discuss above, neither the plaintiff's alleged substantive due process right to visitation nor her alleged substantive due process right to the prevention of pregnancy and marriage can be char-

acterized as fundamental. At the least, *McKinney* precluded the use of the "shock the conscience" test to establish new fundamental rights in an action for damages. Similarly, *McKinney* eliminated the plaintiff's procedural due process claim because Georgia law afforded the plaintiff redress for her alleged procedural deprivation. *See id.* at 1558–59. Hence, regardless of what rights were clearly established in 1993, by 1994 the plaintiff's alleged due process rights no longer existed.

Judge Kravitch recognized that *McKinney* intervened between *Riley I* and *Riley II,* but she decided that *McKinney* could not be described as "a contrary decision of law applicable to this case." *Post* at 982 n. 4. She appears to have reached this conclusion for two reasons. She first noted that *Bendiburg v. Dempsey,* 909 F.2d 463 (11th Cir.1990), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991), held in 1990 that " '[s]ubstantive due process prohibits the government from engaging in certain activities regardless of [the] procedure' used to implement that activity." *Post* at 982 n. 4 (quoting *Bendiburg,* 909 F.2d at 468). Because this court decided *Bendiburg* three years before *Riley I,* Judge Kravitch suggested that the *Riley I* panel was already aware of the limitations *McKinney* placed on the assertion of due process claims when it denied the defendants' claim of qualified immunity. *See post* at 982 n. 4.

Second, Judge Kravitch cited *Taylor By and Through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) (en banc). I do not fully understand why she cited this particular case. I believe that Judge Kravitch thought that *Ledbetter* gave rise to a substantive due process claim similar enough to the plaintiff's claim to have given defendants Winkler and Camp notice that what they were doing violated the plaintiff's constitutional rights. *See generally post* at 982 n. 4 (paraphrasing *Ledbetter* as establishing "[a] substantive due process claim in [a] child's liberty interest in safety in his environment and [a] procedural due process claim based on Georgia['s] statutory foster care scheme"). Based on her reading of *Bendiburg* and *Ledbetter,* Judge

Kravitch apparently concluded that the *Riley I* panel took into account the reasoning of *McKinney* and decided that the plaintiff nevertheless had alleged the violation of clearly established constitutional rights.

There are problems with each aspect of this argument. First, unlike the *Riley II* panel, the *Bendiburg* court *rejected* the plaintiff's substantive due process claims. Right after the sentence quoted by Judge Kravitch in her opinion, the *Bendiburg* court wrote, "Since the government may intervene in the family relationship when following proper procedures upon appropriate facts, [the plaintiff] has no constitutional right which can survive procedural due process." *Id.* at 468. The same reasoning bars Riley's substantive due process claim for the defendants' denial of visitation. Thus, even if the *Riley I* panel knew of *Bendiburg*—as it should have—it certainly did not follow it. *See supra,* note 11.

Second, *Ledbetter* did not give the plaintiff a clearly established substantive due process right to the prevention of her child's pregnancy and marriage while in foster care. In *Ledbetter,* a child's guardian brought suit on her behalf against the state when the child's foster mother beat her into a coma. *See Ledbetter,* 818 F.2d at 792. The court held that a child involuntarily placed in a foster home may bring a section 1983 action for violations of her own due process rights if the child alleges that state officials in charge of the foster care program were deliberately indifferent to her welfare. *See Ledbetter,* 818 F.2d at 797. In the present case, by contrast, the *mother* of a child who *voluntarily* sought foster-care placement has brought a section 1983 action for *the mother's own* supposed due process right to have the state prevent her child from secretly becoming pregnant and marrying without the mother's consent. Regardless of whether the rights announced in *Ledbetter* were clearly established in 1988, the rights asserted by the plaintiff in this case were not.

Third, and most importantly, a prior panel of this court rejected the very type of argument made by Judge Kravitch. In *Flint Elec. Membership Corp. v. Whitworth,* 68

F.3d 1309 (11th Cir.1995) (per curiam), *modified,* 77 F.3d 1321 (1996), two private electricity providers brought suit under section 1983 against the Georgia Department of Corrections (the "DOC") and a rival electricity provider. *Id.* at 1311. The plaintiffs alleged, *inter alia,* that the DOC violated their substantive and procedural due process rights when it awarded electrical services contracts to the rival provider in violation of a state law that required such contracts to go to the "lowest responsible bidder." *See id.*

The district court initially dismissed the plaintiff's claims on the ground that they failed to state a claim for relief, but a panel of this court reversed. *See Pataula Elec. Membership Corp. v. Whitworth,* 951 F.2d 1238, 1241–42 (11th Cir.). This first panel found that the plaintiffs had stated a cognizable due process claim. *See id.* at 1243–44. The first panel also found that the rights underlying the plaintiff's claims were clearly established at the time the DOC awarded the contracts in question; as such, the first panel found that the defendants were not entitled to qualified immunity. *See id.* at 1244.

On remand, the district court proceeded with discovery, at the completion of which the defendants moved for summary judgment based on qualified immunity. The district court denied their motion, and they appealed. A second panel of this court considered their claim in the *Whitworth* opinion cited above. After concluding that it had jurisdiction over the issue of qualified immunity, the *Whitworth* panel stated, "This court's prior decision that the DOC defendants were not entitled to qualified immunity from § 1983 damages is binding here as law of the case unless ... controlling authority has been rendered which is contrary to the law of the previous decision." *Whitworth,* 68 F.3d at 1312. The *Whitworth* panel, however, found that a controlling, intervening decision *did* contradict the prior panel's hold-

ing—none other than *McKinney v. Pate. See Whitworth,* 68 F.3d at 1313.

According to *Whitworth, McKinney* eliminated the plaintiff's substantive and procedural due process claims. *See id.* The *Whitworth* panel found that *McKinney* had eliminated the *Whitworth* plaintiff's section 1983 substantive due process claims.[16] *See id.* Similarly, the panel reasoned that, under *McKinney,* a plaintiff cannot suffer a deprivation of procedural due process "unless and until the State ... refuses to make available a means to remedy the deprivation." *Id.* (quoting *McKinney,* 20 F.3d at 1563) (internal quotation marks omitted). Because Georgia state law provided a remedy for the procedural deprivation alleged by the plaintiffs, *McKinney* foreclosed their procedural due process claim.[17] *See id.* at 1314. In short, the court concluded that the defendants were entitled to qualified immunity, notwithstanding the doctrine of law of the case, because *McKinney* undermined the rights asserted by the plaintiffs. *See id.*

I believe that *McKinney* itself provided controlling authority which contradicted *Riley I*'s supposed denial of the defendants' claim of qualified immunity. Regardless of the applicability of *McKinney,* however, the reasoning of *Whitworth,* a decision handed down before *Riley II,* bound the panel in this case. Both decisions point to the same conclusion: even assuming that the due process rights asserted by the plaintiff were clearly established when the *Riley I* panel affirmed in 1993, this court had eliminated those rights by 1996. Therefore, the law of the case doctrine does not control here.

### 3.

Even if the evidence at summary judgment was not substantially different from the evidence after trial and no intervening authority contradicted the holding of *Riley I,* I still believe that the *Riley I* panel clearly erred as a matter of law. The *Riley I* panel either affirmed an erroneous decision or heard an

---

**16.** Although the substantive due process claim alleged in *Whitworth* differs from those asserted by the plaintiff here, the same analysis applies. *McKinney* eliminates both.

**17.** This holding confirms my view of the procedural due process claim discussed in notes 6 and 14, *supra.*

appeal over which it had no jurisdiction. The error of *Riley I*, if applied as law of the case to the present appeal, would cause a manifest injustice because the defendants would be held liable for $600,000 in money damages for the violation of rights that have *never* been clearly established. The law of the case doctrine cannot apply where "the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice." *Piambino*, 757 F.2d at 1120. Therefore, it should not apply here.

When this court cites 11th Circuit Rule 36–1 in an order, the court issues the order for one or more of the reasons stated in the rule. A Rule 36–1 affirmance is appropriate when an opinion would have no precedential value and

(a) the judgment of the district court is based on findings of fact that are not clearly erroneous;

(b) the evidence in support of a jury verdict is sufficient;

(c) the order of an administrative agency is supported by substantial evidence on the record as a whole;

(d) a summary judgment, directed verdict, or judgment on the pleadings is supported by the record; [or]

(e) the judgment has been entered without a reversible error of law.

11th Cir. R. 36–1.

Only subpart (e) of Rule 36–1 could possibly justify the *Riley I* panel's citation of the rule. Subpart (a) did not apply to this case because the district court made no findings of fact; rather, it denied summary judgment on the ground that "genuine issues of material fact remain in the case." Subpart (b) did not apply because there was no jury verdict at that stage of the litigation. Subpart (c) did not apply because this litigation involved no administrative orders. Finally, subpart (d) did not apply because the district court *denied* summary judgment. Therefore, by citing 11th Circuit Rule 36–1, the *Riley I* panel affirmed the district court's denial of qualified immunity on the ground that "the judgment has been entered without a reversible error of law." [18]

As noted above, "the judgment" in this particular appeal was the district court's ruling that "genuine issues of material fact remain in the case." The district court's order could have one of two meanings, both of which would have rendered inappropriate the *Riley I* panel's citation of Rule 36–1(e). First, the district court could have denied summary judgment based on qualified immunity because the pleadings were too vague for the court to frame the legal question of qualified immunity.[19] The district court could have "simply deferred final decision on the immunity question until the plaintiff's pleadings were sufficiently 'developed' for the court to identify the factual contentions and to assess the merits of the qualified immunity defense in light of the facts presented." *Bennett v. Parker*, 898 F.2d 1530, 1537 (11th Cir.1990) (Tjoflat, J., concurring).

Under then-existing precedent, however, this court would have had no jurisdiction

---

18. Rule 36–1 was clearly designed to dispose of cases resolved by a final judgment. For example, subparts (a), (d), and (e) use the word "judgment." The denial of qualified immunity does not create a final judgment, so it is questionable whether the *Riley I* panel should have applied Rule 36–1 at all. I assume for the sake of discussion that subpart (e) applies in this case. *See generally Mitchell*, 472 U.S. at 530, 105 S.Ct. at 2817 ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

19. The district court might well have wondered exactly what the plaintiff was alleging. For example, the plaintiff characterized her substantive due process claim as follows:

The acts and omissions of the Defendants Camp and Winkler were governmental conduct that "shocks the conscience," and were actions which offend the "canons of decency and fairness which express the notions of justice of English speaking peoples," and were actions taken for the purposes of oppression in contravention of the rights guaranteed to Plaintiff by the substantive protections of the due process clause of the Fifth and Fourteenth Amendments....

The Fifth Amendment obviously does not apply here—the acts complained of were committed by state rather than federal officials.

over an appeal from such a decision. *See, e.g., Riley v. Wainwright*, 810 F.2d 1006, 1007 (11th Cir.1987) (dismissing the defendants' appeal because the district court denied qualified immunity solely on the ground that "the case required substantial factual development before it could be determined with finality whether [the plaintiff] had been subjected to constitutional deprivation and, if so, whether some or all of the defendants were entitled to the benefit of qualified immunity"); *see also Bennett*, 898 F.2d at 1537 (explaining that the court of appeals has no jurisdiction over the denial of qualified immunity where "the plaintiff's *pleadings* were not sufficiently developed to permit the district court to identify, and then to assume as true, a particular set of facts"). If the district court denied the defendants' motion for summary judgment on this ground, then *Riley I* erred by taking jurisdiction over the appeal.

Second, the district court could have denied summary judgment based on qualified immunity because it wrongly believed that the mere existence of factual issues precluded the issuance of summary judgment on this ground. As noted above, when defendants move for summary judgment based on qualified immunity, a district court must determine whether the operative facts, viewed in a light favorable to the plaintiff, demonstrate that the defendants violated a legal right that was clearly established at the time of their conduct. *See Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816. Provided that the pleadings are sufficiently clear, the existence of factual issues never prevents a district court from ruling on the legal issue of qualified immunity: the district court eliminates all factual issues by viewing the existing evidence in a light favorable to the plaintiff. *See Bennett*, 898 F.2d at 1535 n. 2. In this case, the

district court's denial of qualified immunity based on the existence of factual issues could very well indicate that the district court erred in its approach to the issue of qualified immunity. If so, then *Riley I* erred in affirming the district court's ruling under Rule 36–1(e).[20]

The error of *Riley I* would work a manifest injustice if *Riley II* applies that decision, as law of the case, to the current appeal. If defendants Winkler and Camp can show that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, then they are entitled to qualified immunity from civil damages. In other words, these defendants are immune from damages unless the law had "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendants' place," that what they were doing violated the plaintiff's constitutional rights. *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

Assuming *arguendo* that the new substantive due process rights announced by *Riley II* are supported in law—which they are not—the *Riley II* panel created these rights in 1996. No reasonable social worker could have known eight years earlier that the conduct engaged in by these defendants would violate the substantive component of the Due Process Clause, especially given the unique facts of this case. No reasonable social worker could have possibly imagined that a two-day delay in affording an alleged child-abuser a custody hearing, at which she was represented by counsel, would give rise to over half-a-million dollars in compensatory and punitive damages.[21] Therefore, *Riley II* would work a manifest injustice by applying

---

**20.** The *Riley I* panel could not have affirmed on the ground suggested by *Riley II*—that is, the operative facts, viewed in a light favorable to the plaintiff, demonstrated a violation of clearly established constitutional law—because the district court did not state this legal conclusion in its opinion. If *Riley I* could affirm under Rule 36–1(e) on a ground that was not stated in the district court's opinion, then Rule 36–1(e) stands for the proposition that we need never write affirming opinions that do not have precedential value—even if the district court got everything wrong but the result! I believe that fairness to

the litigants before us cautions against such an approach.

**21.** As discussed *supra*, the plaintiff received all the process that she was due—and all the process which she actually requested at the time. Thus, to the extent that the judgment depends on the plaintiff's procedural due process claim, the plaintiff has received $600,000 for the two-day delay between taking Rena into custody on March 22 and the hearing on March 24.

the erroneous *Riley I* decision to foreclose the defendants' second appeal of the issue of qualified immunity.

In sum, the *Riley II* panel erred when it created two new rights under the substantive component of the Due Process Clause. It further erred in holding that the law of the case foreclosed the defendants' second appeal of the issue of qualified immunity. The *Riley II* panel should have considered the merits of the appellants' defense. Instead, its decision simultaneously stakes out new frontiers of due process liability and curtails the defense of qualified immunity. *Riley II* will clearly cause all manner of government officials to "err on the side of caution" in the daily conduct of their duties. I need not dwell on the particular effect this decision will have on those who administer social services to victims of child abuse—an award of damages in excess of ten times the annual income of Winkler and Camp speaks for itself.

### III.

The district court's handling and resolution of this case was fraught with errors. These errors, moreover, were magnified and compounded by the errors of the panel in *Riley II*. The panel summarily approved of the unjustified expansion of substantive and procedural due process and misapplied the law of the case doctrine, severely limiting the defense of qualified immunity.

Judge Birch suggests that the members of the jury were sending a message with their verdict, a message that "busybodies in government can go too far and in this case they crossed the line." *Post,* at 990. Although that message may be fine, the method by which *Riley II* allowed the district court—and the jury—to send it decidedly is not. *Riley II* has said that a jury may determine the parameters of the Due Process Clause of the Fourteenth Amendment. This reduces the Due Process Clause to nothing more than a catch-all provision that creates a cause of action for any abuse of government power. This is not a principled rule; this is not a workable rule of law.

The *Riley II* panel's opinion is now the law of the circuit. As such, it "clearly establishes" that social workers may be liable to parents and guardians for money damages under 42 U.S.C. § 1983 for their discretionary decisions regarding visitation rights, as well as for injuries inflicted by third parties on children in foster care. The practical effects of the panel's decision will be far-reaching. Hundreds, if not thousands, of social services case workers within our circuit, and many thousands of abused and neglected children, will be palpably affected. Facing liability for any perceived error in judgment and with little expectation of qualified immunity, case workers may be expected to hesitate before taking children out of abusive situations. When they do remove a child from her guardian's custody, they must then monitor the child in her new environment, so closely as to protect the child both from herself and from the evil intentions of third parties.

The *Riley II* opinion also will substantially limit interlocutory appeals of denials of qualified immunity by *all* officials accused of violations of the Constitution or federal law, not just those officials who provide child protective services. The purpose of qualified immunity is "to prevent public officials from being intimidated—by the threat of lawsuits which jeopardize the official and his family's welfare personally—from doing their jobs." *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996). Interlocutory appeals of denials of qualified immunity cut the costs of such suits and allow the judicial system to dispense with claims against officials entitled to immunity without the expense of a full trial. The *Riley II* panel's rule powerfully discourages such appeals. Under the panel's rule, a public official taking such an appeal runs the risk of forever being foreclosed on the issue by the law of the case doctrine. Such an official may now be well-advised to suffer a trial before expending his one appeal. This result will not serve the purpose of qualified immunity, and the Constitution does not require this result.

Because the court today has refused to correct a clear violation of circuit and Supreme Court precedent, and because the

court's inaction may be expected to have grave effects on the well-being of children in distress and on the availability of qualified immunity in this circuit, I respectfully dissent.

APPENDIX

DO NOT PUBLISH

SANDRA D. RILEY, Plaintiff–Appellee,

versus

LARUE T. CAMP, LORI WINKLER, f/k/a Lori Webb, Defendant–Appellants.

No. 94–9118.

IN THE UNITED STATES
COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

April 26, 1996.

Appeal from the United States District Court for the Northern District of Georgia.

Before KRAVITCH and BIRCH, Circuit Judges, and GOODWIN*, Senior Circuit Judge.

BIRCH, Circuit Judge:

This appeal concerns whether a parent can recover a substantial monetary jury award from social workers employed by a county department of family and children services, based on the removal of a minor child from the parent's home, in violation of the parent's substantive and procedural due process rights. The jury awarded the parent $600,-000. The district court denied the defendants' motion for judgment as a matter of law and for a new trial. We AFFIRM.

I. BACKGROUND

On March 22, 1988, Regina Rena Landress[1] ("Rena"), then a fifteen-year-old ninth-grade student who lived with her mother, plaintiff-appellee Sandra D. Riley ("Riley"), who was her permanent legal custodian, was taken into protective custody by the Jasper County Department of Family and Children Services ("DFACS"), a county division of the Georgia Department of Human Resources. While there is some dispute concerning the events prior to March 22, 1988, certain facts are undisputed. In March of 1988, Rena was dating Billy Westbrook ("Billy"), then an eighteen-year-old high school senior and son of James Westbrook, a Jasper County Commissioner, and Louise Westbrook, his wife. Concerned that Rena was seeing Billy too often and that the relationship might become too intimate, Riley had forbidden Rena from going on dates with Billy on school nights. On Tuesday, March 15, 1988, Rena and Billy disregarded Riley's rule and went out on a date. When Rena returned home that night, Riley spanked her four to six times on her buttocks with a belt, in the presence of Riley's husband and Rena's stepfather, H. Curtis Riley.

Rena did not seem to be injured by the spanking, and did not cry when it was administered. She went to school the next day, lived at home, and attended school that entire week without incident. On Monday, March 21, 1988, defendant-appellant Lori Winkler (nee Webb), a DFACS Senior Caseworker, received an anonymous telephone call, informing her that Rena had been "beaten" and referring Winkler to Louise Westbrook. Although Louise Westbrook had no firsthand knowledge of the incident, she related to Winkler what Billy and Rena had told her about the spanking. Winkler and another caseworker went to Jasper County High School thereafter, and interviewed Rena while she was in gym class. Rena told them about the spanking and allegedly showed them several bruises on her upper thighs.[2] Rena later told Billy that the case-

* Honorable Alfred T. Goodwin, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

1. Although her name is now Regina Landress Westbrook, we refer to Mrs. Westbrook by her maiden name because all of the events in this case occurred prior to her marriage to Billy Westbrook.

2. There is substantial dispute as to whether Winkler and Williams observed any bruises on Rena. It is not clear that such bruises existed at that time.

workers had come to take photographs, although Winkler and her associate testified that no photographs were ever taken.[3]

While talking with Rena, Winkler told her about foster care, and explained that the Juvenile Complaint process required the caseworkers to talk with the parent in such a situation. Rena told them that she did not want to be placed in foster care, and that she was not sure how her mother would react to such a visit. Immediately after interviewing Rena, the caseworkers went to Riley's home, but she was not there. They then called Rena and told her not to mention their visit to her mother, since they had not yet spoken with her. Later in the afternoon on March 21, Billy came into the Jasper County DFACS office and spoke with defendant-appellant Larue T. Camp, then the director of Jasper County DFACS, and Winkler. Billy told them that he wanted to talk to Rena before anything was done, and promised to bring her to the Jasper County DFACS office in the morning.

Rena spent the evening of March 21, 1988, at home without incident. Billy and Rena went to the Jasper County DFACS office the next morning; Rena told Winkler that she wanted to go into foster care because she was unsure of how her mother would react to a visit by the Jasper County DFACS caseworkers.[4] After discussing Rena's request, Camp and Winkler decided to take her into foster care at that time, which was approximately 10:00 A.M. on March 22, 1988; at this point, Camp and Winkler had not spoken with Riley, Rena's stepfather, Rena's sister, or any of Rena's friends. Furthermore, Camp and Winkler did not have Rena examined by a physician for signs of abuse before taking her into protective custody. The caseworkers then allowed Rena to return to

school with Billy on March 22. They also permitted her to stay at the home of her friend, Julie Lewis. Winkler admitted at trial that the Lewis home was not a state-approved foster home, nor was it a court-approved foster home. R7–385. On March 22, Winkler also visited Riley, who testified at trial that she specifically asked Winkler if she had an order, and Winkler said "no, but we can get one."[5] R6–132.

Two days after placing Rena in the care of the Lewises, a shelter care order was signed by Judge William Prior, dated March 24, 1988. Joint Ex. 7. Judge Prior also held a detention hearing on March 24, 1988, which was attended by Riley, her husband, and their attorney. Both the DFACS attorney and Winkler testified for DFACS. Based on their testimony, Judge Prior entered a formal detention order, dated March 24, 1988.

While in foster care, Rena spent most of her time with Billy. Billy testified at trial that Camp and Winkler encouraged him to spend time with Rena and told him that she needed to talk to someone whom she could trust. R8–642–643. Billy also testified that, while Rena was in foster care, they had sexual intercourse "pretty often," including many times on his parents' property. R8–646–647. After approximately two weeks of living with the Lewises, Rena requested that she be moved to the home of another friend, Susan Bell. Camp and Winkler approved of this request, although the Bell home was not a state-approved foster home, nor was it a court-approved foster care home.

While Rena was in foster care, Riley was permitted limited visitation with her daughter. On April 14, 1988, Winkler discontinued Riley's visitation, upon Rena's request, until after a hearing scheduled for April 26, 1988. Rena became pregnant in May or June of

---

**3.** This fact is important because both caseworkers testified at trial that, in most cases, photographs were taken of the alleged physical abuse. R9–899; R7–494.

**4.** Rena testified at trial that Billy wanted her to be placed in foster care, and that she wanted to please him. R9–867.

**5.** The caseworkers claim that the DFACS attorney, Special Assistant Attorney General Phillip

Spivey, told them that they had a verbal order authorizing them to take Rena into protective custody. The judge from whom it was allegedly obtained has no recollection of giving such an order, and the official "Juvenile Complaint Form," which was completed by Winkler, indicates that such an order was received at 3:00 P.M. on March 22, five hours *after* Rena was taken into protective custody. Joint Ex. 14.

1988. Consequently, Rena was authorized under Georgia law to marry Billy without her mother's permission. On June 11, 1988, Rena and Billy were married, while Rena was still in the protective custody of the Jasper County DFACS. Shortly thereafter, the Jasper County DFACS dismissed its petition for temporary custody of Rena.

Riley then filed this 42 U.S.C. § 1983 claim against Camp and Winkler, alleging violations of her substantive and procedural due process rights. The procedural due process claim alleged that Camp and Winkler took Rena into protective custody prior to affording Riley notice and a hearing, when there was no emergency situation. The substantive due process claim alleged that, by acting with gross negligence and deliberate indifference in supervising Rena in foster care, Camp and Winkler permitted Rena to become pregnant and to marry without her mother's permission, thereby destroying the parent-child relationship. Riley also alleged a pendent state law claim for loss of custody and control of her daughter. After summary judgment was denied, and the denial of qualified immunity was affirmed without opinion by this court, *Riley v. Camp*, 990 F.2d 1268 (11th Cir.1993), the case proceeded to trial. The jury found that the Jasper County DFACS had not obtained a court order prior to taking Rena into protective custody and placing her in foster care, and also that Camp and Winkler violated Riley's substantive due process rights. The jury awarded Riley $600,000, $500,000 of which was punitive damages. After the verdict, Camp and Winkler filed a motion for judgment as a matter of law, or, alternatively, moved for a new trial. Their motion was denied, and this appeal followed.

## II. DISCUSSION

On appeal, Camp and Winkler argue that the district court erred in (1) not granting judgment as a matter of law to them on the substantive due process issue; (2) not granting judgment as a matter of law to them on the procedural due process issue; (3) failing to find that qualified immunity protects Camp and Winkler in this case; (4) not granting judgment as a matter of law or a new trial to Camp and Winkler because the evidence was insufficient to support the jury finding that there was no initial verbal order authorizing custody; (5) not granting judgment as a matter of law or a new trial to Camp and Winkler because the evidence was insufficient to find a violation of substantive due process; (6) not granting a new trial or remittitur because the evidence was insufficient to find elements necessary for punitive damages; and (7) not granting a new trial or remittitur because the verdict was excessive. Although these issues were briefed separately by the parties, many of them involve different aspects of the same motion, and therefore we discuss those related issues together.

### A. *Judgment as a Matter of Law*

Camp and Winkler argue that the district court erred in failing to grant them judgment as a matter of law as to the issues of substantive due process, procedural due process, and whether or not there was an initial verbal order authorizing the Jasper County DFACS to take Rena into protective custody. Prior to the verdict, Camp and Winkler moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50, at both the close of the plaintiff's evidence and at the close of all the evidence. The district court denied those motions. Camp and Winkler then filed a post-judgment Rule 50 motion, which the district court also denied.

"We review rulings on motions for judgment as a matter of law by applying de novo the same legal standards used by the district court." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir.1993) (citing *Miles v. Tennessee River Pulp & Paper Co.*, 862 F.2d 1525, 1528 (11th Cir. 1989)), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). Both the district court and the appellate court must consider all of the evidence, "but all reasonable inferences must be drawn in the nonmovant's favor." *Id.* "If the jury verdict is supported by substantial evidence—that is, enough evidence that reasonable minds could differ concerning material facts—the motion should be denied." *Id.* Regarding the substantive due process issue, the jury found in its verdict on

special interrogatories that Winkler unilaterally denied Riley the right to visit Rena, "even though her residual parental rights had not been terminated by a court of competent jurisdiction." R3–69–3. In addition, the jury determined that Winkler acted with "gross negligence, deliberate indifference, or specific intent in doing so." *Id.* The jury also concluded that both Camp and Winkler "by deliberate indifference, gross negligence, or intentional misconduct failed in their duty to supervise or care for Regina Rena Landress while she was in defendants' custody, which resulted in the child becoming pregnant and marrying while in defendants' care, thus permanently depriving plaintiff [Riley] of her liberty interest in the care, custody, control, society and services of her child." *Id.* Because all of these findings of the jury are supported by substantial evidence, the Rule 50 motion properly was denied by the district court as to the substantive due process issue.

Concerning the procedural due process issue, the jury found in its special interrogatories that Camp and Winkler "had not obtained approval by a judge before taking Regina Rena Landress into custody," and that, at the time that Rena was taken into custody, no emergency situation existed which threatened Rena's health or welfare. R3–69–1–2. The jury also found that predeprivation notice and a hearing for Riley were feasible before the Jasper County DFACS took Rena into protective custody. R3–69–2. It is evident that these findings are supported by substantial evidence. Therefore the district court properly refused to grant judgment as a matter of law on the procedural due process issue.

Camp and Winkler also contend that the district court erred in failing to grant them judgment as a matter of law because the evidence was insufficient to support the jury's finding that there was no initial verbal order authorizing custody. The evidence as to the existence of a verbal shelter care order on the morning of March 22, 1988, is less than clear. Even the Jasper County DFACS's own documents reflect that the order was not received until later that afternoon. Joint Ex. 14. In reviewing the record on appeal, particularly the trial transcript, it is clear that there is enough evidence on this issue that reasonable minds could differ concerning this material fact; consequently, judgment as a matter of law properly was denied by the district court on this issue.

## B. *New Trial*

Camp and Winkler argue that, even if they are not entitled to judgment as a matter of law, they are entitled to a new trial because the evidence was insufficient to support the jury's finding that there was no initial verbal order authorizing custody, and the evidence was insufficient to find a violation of Riley's substantive due process rights. The district court denied Camp and Winkler's motion for a new trial. We review denial of a motion for a new trial under the abuse of discretion standard. *Redd v. City of Phenix City,* 934 F.2d 1211, 1214 (11th Cir.1991). "However, 'to assure that the judge does not simply substitute his judgment for that of the jury, ... we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great, not merely the greater weight of the evidence.'" *Id.* (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.1984) (quoting *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 363 (5th Cir.1980) (per curiam))).

The evidence that Camp and Winkler argue is insufficient is set forth above in addressing their appeal of the district court's denial of their motion for judgment as a matter of law, and we need not restate it. Reviewing the district court's denial of the new trial motion under an abuse of discretion standard, it is evident that the court below did not abuse its discretion, for the verdict is not against the great weight of the evidence. Accordingly, we affirm the district court's denial of Camp and Winkler's motion for a new trial.

## C. *Qualified Immunity*

Camp and Winkler argue that the district court erred in failing to find that qualified immunity protects them in this case. Riley argues that the doctrine of the law of the case prohibits us from reconsidering the is-

sue of qualified immunity, since a prior panel of this court already ruled on the issue. After Riley filed her complaint, Camp and Winkler moved for summary judgment on several grounds, including qualified immunity. The district court denied the motion, and Camp and Winkler appealed to this court. We affirmed the district court's denial of summary judgment without opinion. Camp and Winkler now argue that the district court did not initially resolve the qualified immunity issue, and thus our prior affirmance does not prohibit us from deciding the qualified immunity issue.

While Camp and Winkler are encouraged that the district court, in denying their summary judgment motion, never used the term "qualified immunity," and only ruled that there were genuine issues of material fact that remained, thereby making summary judgment inappropriate, they ignore the obvious jurisdictional basis for the former appeal. If the district court did not rule on the qualified immunity issue in its order denying summary judgment, then that interlocutory denial of summary judgment would not have been appealable to us at that time. "The denial of a motion for summary judgment generally is not a final judgment for the purposes of appellate jurisdiction. However, an exception exists where the summary judgment motion is based on a claim of qualified immunity 'to the extent that [the denial] turns on an issue of law....'"[6] *Swint v. City of Wadley,* 51 F.3d 988, 1002 (11th Cir.1995) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985)).

In their initial appeal to the denial of summary judgment, Camp and Winkler cited *Mitchell* in the jurisdictional statement in their brief, noting that this court had jurisdiction because the defendants [Camp and Winkler], whose summary judgment motion was denied, asserted qualified immunity. Because we had jurisdiction then to hear their initial appeal, based on denial of summary judgment on the ground of qualified immunity, Camp and Winkler cannot now argue that the district court did not rule on the qualified immunity issue in denying their summary judgment motion. "Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case." *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982) (citations omitted). Therefore, the law of the case doctrine bars our reconsideration of the qualified immunity issue.

D. *Remittitur and Excessiveness of the Verdict*

Camp and Winkler finally contend that the district court erred in not granting a new trial or remittitur because the verdict was excessive, and also because there was insufficient evidence to support a punitive damage award. In evaluating whether a verdict is excessive, we must determine whether the verdict is so excessive as to "shock the judicial conscience." *Woods v. Burlington Northern R.R. Co.,* 768 F.2d 1287, 1292 (11th Cir.1985) (per curiam) (citing *Jackson v. Magnolia Brokerage Co.,* 742 F.2d 1305, 1306–07 (11th Cir.1984)), *rev'd on other grounds,* 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). In this case, there was

---

**6.** In denying summary judgment, the district court simply stated that "genuine issues of material fact remain in the case and that therefore summary judgment is inappropriate." R2–56–2. Implicit in its statement was the district court's determination that the law was "clearly established," but that the conduct alleged to have been violative of such law was subject to dispute, or genuine issues of material fact were present. Therefore, the district court concluded that qualified immunity was inappropriate. We note for edification that the Supreme Court has recently narrowed the issues that are reviewable under *Mitchell. Johnson v. Jones,* 515 U.S. 304, 312–

14, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995). "Where ... a district court finds that there exists a genuine issue of material fact regarding the conduct claimed to violate clearly established law, there is no 'final decision' and no interlocutory appellate jurisdiction under *Mitchell* to review the denial." *Babb v. Lake City Community College,* 66 F.3d 270, 272 (11th Cir. 1995)(per curiam) (citing *Johnson* at 312–14, 115 S.Ct. at 2156). Thus, today if we were faced with the appeal that we heard in this case in 1993, we would dismiss for lack of jurisdiction, based on the Supreme Court's recent pronouncement.

sufficient evidence to warrant the jury's award, even though the amount was substantial. "A surprisingly large verdict, however, is not sufficient justification for an appellate court's substitution of its evaluation of plaintiffs' damages for that of the jury." *Id.* Thus, we conclude that the district court did not abuse its discretion in failing to grant a new trial or remittitur on the ground that the verdict was excessive.

Regarding the punitive damages, it is well established that generally "before an award of punitive damages is authorized in a civil rights action the jury must find, and the evidence must support its decision, that the defendant was motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights." *Anderson v. City of Atlanta,* 778 F.2d 678, 688 (11th Cir.1985) (citing *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). In this case, the jury made such a finding in its special interrogatories, noting that Camp and Winkler acted with "gross negligence, deliberate indifference, or specific intent," and that this behavior "shocks the conscience or offends the standards of decency and fairness which express the notions of justice of English speaking peoples." R3–69–3–4. In addition, the evidence offered by the plaintiff arguably supports an award of punitive damages. We review the district court's determination as to the punitive damages issue for an abuse of discretion. *American Employers Ins. Co. v. Southern Seeding Servs., Inc.,* 931 F.2d 1453, 1458 (11th Cir. 1991) (quoting *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)). Under this standard, it is clear that the district court did not abuse its discretion is refusing to grant a new trial or remittitur on the ground that the evidence was insufficient to support the punitive damages award.

## III. CONCLUSION

In this civil rights action, Riley alleged that Camp and Winkler of the Jasper County DFACS violated her substantive and procedural due process rights when they took her daughter into custody and placed her in foster care, where she became pregnant, married, and emancipated. The jury awarded Riley $600,000, and the district court denied Camp and Winkler's motion for judgment as a matter of law or new trial. For the reasons discussed herein, we AFFIRM.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

### I.

The majority holds that the law of the case doctrine governs the qualified immunity issue raised in this case because a prior panel of this court implicitly ruled that the defendants in this case were not entitled to qualified immunity. I concur separately in order further to justify application of the law of the case doctrine in this context.[1]

First, it should be noted that several of this circuit's cases involving interlocutory appeals from summary judgment qualified immunity determinations have stated in dictum that qualified immunity can be raised at trial even if initially denied at the summary judgment stage. *See Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995) ("Any qualified immunity defenses that do not result in summary judgment before trial may be renewed at trial, where the actual facts will be established."); *Kelly v. Curtis,* 21 F.3d 1544, 1546 (11th Cir.1994) (qualified immunity defense may be raised anew at trial); *see also Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1233 (11th Cir.1992) (where district court determines no qualified immunity due under plaintiff's version of facts, court will have to revisit issue on motion for directed verdict); *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1579 n. 8 (11th Cir.1992) (Edmondson, J. dissenting) (same), *vacated,* 962 F.2d 1563, *dissenting opinion adopted,* 998 F.2d 923, 923 (11th Cir.1993) (en banc). Implicit in this view is the proposition that district courts can revisit the qualified immunity question even where a circuit court has

---

1. The term "law of the case" as used here describes how an appellate court opinion rendered in a case should be treated by the district court on remand and by a subsequent appellate panel in the same case. It does not refer to the treatment a district court should afford its own previous rulings in a case.

ruled on the issue.[2] These directives, however, are not inconsistent with the application of law of the case doctrine.

Although the law of the case doctrine is not binding on a subsequent appellate court in the same way res judicata would be (i.e., it is not a limitation on the court's power), applying the law of the case doctrine serves several important purposes. It protects against the agitation of settled issues by promoting finality, assures the adherence of trial courts to the decisions of appellate courts, and avoids waste of judicial resources. *See* 1B Moore's Federal Practice ¶ 0.404[1].

The law of the case doctrine requires that a prior appellate decision govern the district court or subsequent appeals court unless an exception to the doctrine applies. An exception applies when (1) the subsequent trial produced substantially different evidence, (2) controlling authority of law applicable to the issue has changed, or (3) the prior panel was clearly erroneous such that following its ruling would work a manifest injustice. In addition, the subsequent panel must determine that the prior panel decided the issue "by necessary implication."[3] Where an earlier panel has explicitly stated the basis for its holding, applying the law of the case is simple. The doctrine applies not only to issues

explicitly decided, however, but also to the issues decided "by necessary implication." *Id.*

Making these determinations after a defendant seeking qualified immunity has moved for judgment as a matter of law will not be unduly cumbersome upon the district court or appellate panel. Any disadvantage is easily offset by the benefits of applying law of the case doctrine which promotes both finality and efficiency and insures respect for appellate opinions without sacrificing defendants' abilities to raise the prior qualified immunity defense anew. In fact, determining whether the subsequent trial produces substantially different evidence is a question the district court must visit in any case upon entertaining a motion for judgment as a matter of law on qualified immunity grounds after having denied summary judgment on qualified immunity. Our cases have established that the question central to the trial court in revisiting the qualified immunity question on a motion for directed verdict is whether the facts as developed at trial differ from those taken in the light most favorable to the plaintiffs at the summary judgment stage. *See Kelly,* 21 F.3d at 1546 (defendants may raise qualified immunity anew at

2. In a somewhat analogous circumstance, the Supreme Court recently held that defendants can appeal from a denial of qualified immunity at both the motion to dismiss stage as well as the summary judgment stage because "resolution of the immunity question may 'require more than one judiciously timed appeal,' because the legally relevant factors bearing upon the *Harlow* question will be different on summary judgment than on an earlier motion to dismiss." *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). That case did not address the merits of applying law of the case doctrine to subsequent appeals. However, implicit in the language of the case is the notion that a decision at the pleadings stage where no record exists will often involve substantially different evidence than an appellate decision rendered at the summary judgment stage where the record has been developed. Thus, the law of the case doctrine would not normally bar revisiting the qualified immunity issue at summary judgment where an appellate court previously had ruled on an appeal from the motion to dismiss.

3. In *Wheeler v. City of Pleasant Grove,* 746 F.2d 1437 (11th Cir.1984), we delineated the general contours of law of the case doctrine as follows:

Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case.... However, the law of the case doctrine does not apply to bar reconsideration of an issue when (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.

[*United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982) (citations omitted).]

.... Further, while the doctrine encompasses only those issues previously determined ... the law is clear that it " 'comprehends things decided by necessary implication as well as those decided explicitly.' " .... The doctrine's purpose is to bring an end to litigation ... It also "protects against the agitation of settled issues and assures obedience of lower courts to the decisions of appellate courts." ....

*Wheeler,* 746 F.2d at 1440.

trial in motions for judgment as a matter of law because, " 'rulings on summary judgment motions' are 'the facts for present purposes,' but they 'may not be the actual facts.' "); *see also Sims,* 972 F.2d at 1233. If, as here, the facts presented by the plaintiffs at the summary judgment stage become, without notable exception, the "actual facts" as developed at trial, there is no need to revisit the qualified immunity determination made by the prior appellate panel. This simple inquiry preserves the defendant's right to raise qualified immunity at trial while also safeguarding the interests of finality, judicial economy, and the superiority of appellate court rulings.

It also makes sense to determine whether the other exceptions to the application of law of the case doctrine apply in deciding whether to follow the prior panel opinion. Determining whether intervening changes in the law overrule the prior panel's holding is necessary before following the panel's opinion. Where, as in this case, the law applicable to the qualified immunity issue has not changed since the prior panel opinion, the prior panel

decision should be followed whether other exceptions do not apply.[4] And, it would not be logical to follow a prior panel ruling without making sure that the prior panel decided the qualified immunity at least "by necessary implication." In this case, the panel, in order to have jurisdiction over the case, had to reach the qualified immunity issue. Thus, in upholding the district court's denial of summary judgment, albeit by summary affirmance, the panel implicitly held that the defendants were not entitled to qualified immunity.[5]

I would add as a final note, however, that only in the rarest of cases will a subsequent panel be forced to conclude that a prior panel was clearly erroneous such that its ruling would result in manifest injustice. This circuit follows a strict policy of following prior panel opinions unless such are overruled by the court sitting en banc. There is little reason to reject the precedential value of a case simply because subsequent litigation has brought previously appealed issues before a new panel.[6]

**4.** Since the prior panel opinion this circuit has attempted to clarify its qualified immunity law and has made some changes in the areas of substantive and procedural due process analysis. *See, e.g., Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146 (11th Cir.1994) (en banc) (qualified immunity); *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (setting out differences between procedural and substantive due process rights; holding only procedural due process right of action to protect state law property right in employment), *cert. denied sub nom., McKinney v. Osceola County Bd. of County Comm'rs,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Neither of these developments, however, can be described as "a contrary decision of law applicable to this case." *Lassiter* only sought to clarify pre-existing precedent, and this circuit had before the prior panel's 1993 decision made the substantive/procedural due process rights distinction for the purposes of rights of action against foster care agencies in *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990) ("[s]ubstantive due process prohibits the government from engaging in certain activities regardless of procedure" provided), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991), and *Taylor By and Through Walker v. Ledbetter,* 818 F.2d 791, 795, 799 (11th Cir.1987) (substantive due process claim in child's liberty interest in safety in his environment and procedural due process claim based on Georgia statutory foster care scheme), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989).

**5.** I agree with the majority in its conclusion that in order to have jurisdiction over the prior appeal, even under then-existing precedent, the panel would have had to have reached the qualified immunity issue. Some cases in this circuit have indicated that in circumstances where a district judge denied summary judgment because genuine issues of material fact existed, a circuit court panel could not reach the qualified immunity issue. *See Howell v. Evans,* 922 F.2d 712, 717–18 (11th Cir.1991) (discussing such cases), *vacated,* 931 F.2d 711 (11th Cir.1991), *reinstated in unpublished order as noted,* 12 F.3d 190, 191 n. *. Had the prior panel relied on the premise that the district court's opinion holding that the existence of a genuine issue of material fact precluded appellate review of the qualified immunity issue, the panel could not have taken jurisdiction but would have had to dismiss the appeal. *See, e.g., Goddard v. Urrea,* 847 F.2d 765, 769 (11th Cir.1988). Thus, the prior panel reached the issue "by necessary implication."

**6.** "The doctrine of law of the case is, then, a heavy deterrent to vacillation on arguable issues, but not designed to prevent the correction of plain error or injustice." 1B Moore's Federal Practice P 0.404 [4.–1]. *But see* 1B Moore's Federal Practice P 0.404 [4.–5] n. 11 ("Surely the court of appeals should not hesitate to correct a patent error in a still live case, but conceivably such errors occur infrequently enough so that they can be taken care of by in banc proceedings.").

## II.

Although I concur in the portion of the opinion affirming the liability judgment, I dissent from that portion affirming the damages award. I would reverse and vacate the portion of the judgment awarding the plaintiff punitive damages. Federal law allows for the imposition of punitive damages in § 1983 actions only "if 'the defendant was motivated by an evil motive or intent, or [if the defendant acted with] reckless or callous indifference to federally protected rights.' " *Davis v. Locke,* 936 F.2d 1208, 1214 (11th Cir.1991) (citing *Anderson v. City of Atlanta,* 778 F.2d 678, 688 (11th Cir.1985)) (finding jury award of punitive damages proper where evidence showed defendants' actions motivated by racial animus and desire to punish); *Wright v. Sheppard,* 919 F.2d 665, 670 (11th Cir.1990) (case "crie[d] out for punitive damages" where policeman at night under cover of uniform invaded home and injured resident); *Washington v. Kirksey,* 811 F.2d 561, 565 (11th Cir.) (finding punitive damages proper where defendant callously refused to comply with settlement agreement regarding pre-termination hearing), *cert. denied,* 484 U.S. 827, 108 S.Ct. 96, 98 L.Ed.2d 56 (1987).

The majority contends that the jury's verdict supports the award of punitive damages because the jury in its verdict on special interrogatories (entered before the damages verdict in this bifurcated proceeding) found that Camp and Winkler acted with " 'gross negligence, deliberate indifference, or specific intent.' " Although the jury might have found gross negligence under the facts of this case, I do not believe that the evidence would support a finding of callous or reckless indifference ·or evil motive sufficient to justify punitive damages. *See Anderson v. City of Atlanta,* 778 F.2d 678 (11th Cir.1985) (reversing jury verdict awarding punitive damages); *Walters v. City of Atlanta,* 803 F.2d 1135, 1147 (punitive damages in § 1983 case unavailable where defendants did not act with ill will or callous disregard).

Thus, respectfully, I dissent from that portion of the majority's opinion affirming the award of punitive damages.

BIRCH, Circuit Judge, concurring in the denial of rehearing *en banc:*

It is not my usual practice to write a defense of this court's decision to deny a petition for rehearing *en banc,* nor do I customarily use the forum of an order denying such a petition to justify a panel's substantive determinations in a given case. As a general proposition, our court has functioned on the premise that, once a majority of the court has voted against *en banc* consideration—that is, once we as a court have determined that a panel's resolution of a case for which a rehearing petition has been filed is *not* in direct conflict with precedent established either by the Supreme Court or this circuit—the petition is denied, the mandate is released, and the matter is closed.[7] The

7. The panel opinion in *Riley II* is not binding precedent under 11th Cir. R. 36–2 and, as a result, is not "the law of the circuit" as stated by Judge Tjoflat in his dissent. *Ante* at 959. Therefore, contrary to Judge Tjoflat's somewhat melodramatic assertion that the effects of this case will be extraordinarily far-reaching, I believe that this case is remarkably *unlikely* to palpably affect the lives of "[h]undreds, if not thousands, of social services case workers within our circuit, and many of abused and neglected children." *Ante* at 974. Moreover, while I would like to think that my judicial colleagues chose not to vote this case *en banc* because they opined that the panel reached a correct result for the right reasons, I am well aware that some may have disagreed with the panel but knew that the opinion would be non-precedential. A denial of *en banc* rehearing is similar to a denial of *certiorari* by the Supreme Court; it communicates little, if anything, about the position of the court or the

issues presented. *Compare Luckey v. Miller,* 929 F.2d 618, 622 (11th Cir.1991) ("[A] summary denial of rehearing en banc is insufficient to confer any implication or inference regarding the court's opinion relative to the merits of a case.... We also believe that attaching precedential weight to a denial of rehearing en banc would be unmanageable.") *with Maryland v. Baltimore Radio Show,* 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) ("Inasmuch, therefore, as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should·be granted, this Court rigorously has insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review."). Indeed, although Judge Tjoflat and I each have outlined the reasoning underlying our respective views of the court's denial of *en banc* rehearing in this particular case, our opinions in this regard, like the

decision regarding whether to hear a case *en banc* is not always unanimous and, on occasion, individual judges remain steadfast in their belief that a case that was not considered by the full court should have been heard. Again, though, our practice has been that, once the members of the court have been polled and a decision to grant or deny the petition rendered, we generally do not belabor the point. This system has worked pretty well. Judge Tjoflat, however, suggests that, even after having thoroughly reviewed all relevant materials in this case and voted against *en banc* rehearing, we have made a mistake that warrants further discussion in published form. He has composed a lengthy dissent to our order denying the petition for *en banc* rehearing that explicates the reasons why, in his view, we have erred. Because, as in all cases that come before our court, there are (at least) two sides to this story, and because the panel that initially reviewed this case, along with the original trial judge and jury, apparently took a very different view of both the facts and law than does Judge Tjoflat, I feel compelled to write separately regarding the basis of the panel's decision.

## A. The Facts

At the outset, it must be emphasized that we do not lightly overturn jury verdicts. In reviewing the denial of a motion for judgment as a matter of law, both the district court and this court must consider all the evidence, "but all reasonable inferences must be drawn in the nonmovant's favor." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir.1993). We repeatedly have stated that, " 'if there is substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[ ] should be denied.' " *Walls v. Button Gwinnett Bancorp, Inc.*, 1 F.3d 1198, 1200 (11th Cir.1993) (quoting *Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d 1429, 1436 (11th Cir.1991)). Indeed, even where a jury's verdict contains apparent inconsistencies, we must make all reasonable efforts to reconcile the verdict; if there is a view of the case which makes the jury's answers consistent, we must adopt that view and enter judgment accordingly. *See Boczar v. Manatee Hospitals & Health Systems, Inc.*, 993 F.2d 1514, 1516 n. 5 (11th Cir.1993). The panel's majority opinion adhered to these commands in describing the facts of this case. Judge Tjoflat's factual recitation, on the other hand, is conveyed in a manner that leads ineluctably to one legal conclusion: The busybodies who injected their social engineering agenda into a fragile family relationship were entitled to qualified immunity. Notwithstanding Judge Tjoflat's narration of the facts in the light most favorable to this single conclusion, the trial judge and jury appear to have decided this issue quite to the contrary. I will not catalogue in detail the various facts and inferences that are overlooked in Judge Tjoflat's dissent. It is enough to note that the simplified, superficial version of events set forth in the dissent reveals the extent to which Judge Tjoflat's novel characterization of the facts—a characterization presented not in the light most favorable to the non-movant or to supporting the jury's verdict but, rather, to confirming a pre-determined legal theory—colors his view of this case.

The dissent's chronological description of events gives rise to an impression that Billy Westbrook ("Billy"), the boyfriend of Rena Landress ("Rena"), was a marginal, incidental figure in this case. These passing references minimize the central role that Billy played. Billy, the eighteen-year-old boyfriend of fifteen-year old Rena, was the son of a county commissioner. Before Rena was taken into custody, but after she was interviewed by Department of Family and Children Services ("DFACS") caseworkers upon a tip from Billy's mother and after the caseworkers apparently decided not to take Rena into protective custody, Billy came into the DFACS office and spoke with defendant Larue T. Camp, then the director of DFACS, and defendant Lori Winkler, a DFACS caseworker. Billy brought Rena to the DFACS office the next day to request that she be taken into protective custody. While in state

court's decision to deny rehearing, have no binding or precedential value.

custody, Rena was allowed to stay in homes that were neither state-approved nor court-approved foster homes. These homes, however, did have the advantage of being "Billy-friendly." It is undisputed that, while in foster care, Rena and Billy had sexual intercourse often, including many times on the property of Billy's parents. The jury could have inferred from these facts that Billy used his access to the courthouse and DFACS to get around Rena's mother and obtain access to the girl and that the defendants were willing participants in his scheme.

In short, the facts as presented by Judge Tjoflat paint the picture of government employees who may have made some mistakes of judgment and procedure in handling this case. Against this background, it is not too difficult to reach the conclusion that they should have been granted qualified immunity. The facts, viewed in the light most favorable to the plaintiffs and as found by the jury, however, paint the picture of irresponsible government employees who recklessly (at best) or intentionally (at worst) wielded their discretionary power for reasons far removed from the best interest of the child and her family.

In the first appeal in this case, the panel affirmed the district court's denial of summary judgment under Local Rule 36–1. *Riley v. Camp*, 990 F.2d 1268 (11th Cir.1993) (unpublished table decision) [hereinafter *Riley I* ]. The panel in the second appeal—the one at issue here—held that it is bound by the *Riley I* panel on the issue of qualified immunity under the doctrine of law of the case. *Riley v. Camp*, 84 F.3d 437 (11th Cir.1996) (unpublished table decision) [hereinafter *Riley II* ]. Judge Tjoflat takes issue with this determination and attacks it on several fronts: First, he argues that *Riley II* created new substantive due process rights previously not recognized by our circuit or the Supreme Court; second, he suggests that the *Riley II* panel misapplied the law-of-the-case doctrine in the context of qualified immunity because (1) the operative facts have changed throughout the successive stages of this litigation, (2) intervening Eleventh Circuit decisional law has eliminated the plaintiff's substantive due process claim, and (3)

an exception to the doctrine of law of the case applies because the result reached in *Riley II* works a "manifest injustice." I will address these arguments in turn.

## B. Substantive Due Process

Judge Tjoflat contends that the *Riley II* panel created new, previously unrecognized substantive due process rights by leaving undisturbed the jury's determination regarding the state's failure both to permit the plaintiff to visit her child and prevent Billy from impregnating and marrying the child while in state custody. In the first instance, Judge Tjoflat argues that the plaintiff has no substantive due process right that survives her right of procedural due process. He relies primarily on *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir.1994) (en banc), a decision that he authored, for this proposition. Contrary to Judge Tjoflat's characterization of *McKinney*, the holding in that case was quite narrow: "[W]e hold that, in non-legislative cases, only procedural due process claims are available for pretextually terminated employees." 20 F.3d at 1560; *see also id.* at 1567 (Edmondson, J., concurring in judgment) (criticizing the majority for discussing aspects of substantive due process not necessary for the resolution of an employment claim). Indeed, the opinion unambiguously differentiates between "employment rights [which] are state-created rights and ... 'fundamental' rights [which are] created by the Constitution." *Id.* at 1560. The former "are not subject to substantive due process protection." *Id.* at 1556.

> The substantive component of the Due Process Clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). The Supreme Court has deemed that most—but not all—of the rights enumerated in the Bill of Rights are fundamental; certain unenumerated rights ... also merit protection.

*Id.* at 1556 (footnote omitted). As an example of an unenumerated right that is considered fundamental, *McKinney* cites the "right of privacy." *Id.* (citing *Planned Parenthood*

v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992)). Although not mentioned in McKinney, the right to family integrity and freedom to rear one's children as one deems fit is also a fundamental right that the Court has recognized for almost one century. See M.L.B. v. S.L.J., —— U.S. ——, ——, 117 S.Ct. 555, 564–65, 136 L.Ed.2d 473 (1996) (stating that "the Court [has been] unanimously of the view that 'the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment.'") (quoting Santosky v. Kramer, 455 U.S. 745, 774, 102 S.Ct. 1388, 1405, 71 L.Ed.2d 599 (1982) (Rehnquist, J., dissenting)); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Notwithstanding Judge Tjoflat's attempt to narrowly define the right at issue here, it is precisely the long-acknowledged right to family integrity that is claimed by the plaintiff in this case.

Judge Tjoflat's isolated reading of language from McKinney stating that a "right is [not] 'fundamental,' [unless] no amount of process can justify its infringement," 20 F.3d at 1557, is culled out of context and given an overly expansive construction. According to this reading, any right that must yield to the state's legitimate interests under certain circumstances is not "fundamental" and is protected by procedural, not substantive, due process. Judge Tjoflat suggests that this type of substantive, fundamental right is exemplified by a prisoner's Eighth Amendment right to be free from cruel and unusual punishment: No matter what the process, a state cannot infringe that right.

It is Judge Tjoflat's definition of a fundamental constitutional right grafted onto a scenario entirely dissimilar from McKinney,

however, that is both novel and inconsistent with Supreme Court jurisprudence concerning substantive due process; indeed, it is beyond dispute that the Supreme Court historically has recognized that fundamental rights—whether enumerated in the Bill of Rights or unenumerated—may be abridged under specified, narrowly-delineated circumstances. A person's First Amendment right to free speech, for example, is unquestionably a "fundamental right" protected by both procedural and substantive due process, yet it is beyond dispute that it is not an absolute right: Under certain circumstances, it must yield to the state's compelling interests. See, e.g., Morris v. Crow, 117 F.3d 449, 456 (11th Cir.1997) (explaining the balancing test established by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as requiring the court to weigh "the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees") (internal quotation marks omitted). Similarly, in its exploration of the parameters of the right to privacy in the context of a woman's decision to have an abortion, the Supreme Court has concluded that "[o]nly where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." Planned Parenthood v. Casey, 505 U.S. 833, 874, 112 S.Ct. 2791, 2819, 120 L.Ed.2d 674 (1992) (emphasis added); see also Griswold v. Connecticut, 381 U.S. 479, 497, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) ("Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.") (internal quotation marks omitted).[8] That is the protection that substantive

---

8. McKinney's discussion of the distinction between legislative and non-legislative acts in the context of substantive due process has no bearing on this case; setting aside the fact that this short discourse in McKinney is dicta, its only function is to distinguish the Supreme Court cases raised by the plaintiff in McKinney from the specific nature of the claim under the facts presented in his case. It is worth noting, however, that allegations of First Amendment violations

as applied in the employment context do implicate executive, rather than legislative, actions; yet the right can be abrogated by the state. Again, McKinney was about state-created property rights and does not control the constitutionally-based claim involved here. See Flint Elec. Membership Corp. v. Whitworth, 68 F.3d 1309, 1313 (11th Cir.1995), modified by 77 F.3d 1321 (11th Cir.1996) ("In McKinney v. Pate ... the court held that § 1983 substantive due process

due process offers fundamental rights, whether they are enumerated in the Bill of Rights, such as free speech, or unenumerated but "implicit in the concept of ordered liberty," such as plaintiff's right to family integrity.[9]

Again, it cannot be over-emphasized that Judge Tjoflat has constructed a revisionist view regarding the facts of this case; this perspective colors his analysis of the case's legal ramifications and helps to explain his charge that the panel has created substantive rights that previously have not been recognized. Although Judge Tjoflat may disagree with this conclusion, it was the panel's determination that the constitutional right at issue here has been around, fully recognized, for quite some time. It is Judge Tjoflat's dissent, not the panel decision, that represents an innovative approach to substantive due process that is neither compelled nor sup-

ported by precedent.[10] In the final analysis, it is critical to realize that this case is not only about gross misjudgment by the defendants. It is about gross misuse of the awesome power of the state for the purpose of satisfying the wishes of a politically connected eighteen-year-old man to have access to his under-age girlfriend. One district judge, two panels of this court, and the jury found these actions to be so outrageous that they offend the substantive component of the Due Process Clause.[11] Perhaps reasonable minds can differ about this conclusion. I suggest that, under these conditions, it is best to leave the jury's determination undisturbed.

## C. The Law of the Case Doctrine

As correctly noted in the dissent, the trial court and appellate court are governed by a prior appellate decision in the same case except when (1) new and substantially differ-

---

claims arising from nonlegislative deprivations of *state-created property interests* are no longer cognizable in this circuit.") (emphasis added) (citation omitted).

9. The dissent's foray into the absence of either a "special relationship" or a "special danger" that would permit the assertion of a constitutional right solely by the plaintiff's daughter is another proverbial red herring. Cases such as *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), have limited application here, where the state has not neglected to provide services to an individual in state custody but, rather, has removed a minor child out of her mother's home, temporarily denied the mother access to her child, and affirmatively assisted her adult boyfriend in obtaining access to the girl so that he can commit what is, after all, statutory rape. Moreover, we previously have held that a *parent's* constitutional right to direct the upbringing of a minor is violated when the state interferes—without compelling justification—in matters concerning the growth, development, and upbringing of children. *See Arnold v. Board of Educ.,* 880 F.2d 305, 312 (11th Cir.1989) (where school officials forced students to have abortions, court held that "a *parent's* constituted right to direct the upbringing of a minor is violated when the minor is coerced to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion; a decision which touches fundamental values and religious beliefs parents wish to instill in their children.") (emphasis added). Similarly, it is the plaintiff's parental, custodial right to guide her own child through adolescence without undue state interference that properly is being asserted in this case.

10. It is worth noting that the original panel in *Riley II* decided not to publish the opinion in that case precisely because the panel believed that the decision was both consistent with and dictated by circuit precedent and created no "new law" meriting publication. *See* 11th Cir. I.O.P 36–5 ("Opinions that the panel believes to have no precedential value are not published.")

11. As Judge Tjoflat acknowledges in his dissent, the jury had to determine that the defendants acted with reckless indifference or "evil motive" in order to justify an award of punitive damages. Contrary to Judge Tjoflat's description, then-Chief Judge William C. O'Kelley did not allow the jury to "create and define new" substantive and procedural due process rights. *Ante* at 964. As previously stated, the due process rights at issue were well-established long before the jury heard this case. *See M.L.B. v. S.L.J.,* —— U.S. ——, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Perhaps these decisions, relied upon by the original panel, should have been cited. However, the law was well-established and the briefs focused not on the sufficiency of the legal predicate involved but on the sufficiency of the evidence. The question of whether the plaintiff had set forth a recognized constitutional right was raised by Judge Tjoflat *after* the panel's decision in the case. Moreover, most parents and legal scholars would be surprised to learn that the rights to family integrity and to rear one's children as one chooses are not "fundamental," as suggested by Judge Tjoflat in his dissent. *Ante* at 964–65.

ent evidence emerges at trial; (2) controlling authority has been rendered that is contrary to the previous decision; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice if implemented. *See Wheeler v. City of Pleasant Grove,* 746 F.2d 1437, 1440 (11th Cir.1984). Judge Tjoflat avers that all three of these exceptions obtain in this instance and, therefore, the *Riley II* panel erred in its application of the law-of-the-case doctrine to *Riley I.* Again, I disagree.

Judge Tjoflat first concludes that we were compelled to revisit the issue of qualified immunity on the basis of cases such as *Behrens v. Pelletier,* 516 U.S. 299, ——, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996) (holding that a defendant's unsuccessful appeal from the denial of its motion to dismiss the claim on grounds of qualified immunity does not bar a subsequent appeal from the denial of its summary judgment motion on the same grounds because different facts may have emerged), as extended to appeals from post-trial motions in *Cottrell v. Caldwell,* 85 F.3d 1480, 1487 (11th Cir.1996) (holding that a defendant may raise the defense of qualified immunity both before trial on a motion for summary judgment and after trial on a motion for judgment as a matter of law).[12] The law of the case doctrine also allows reconsideration of an issue "when ... a subsequent trial produces substantially different evidence." *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982).

Again, however, Judge Tjoflat applies an unjustifiably broad construction to the rules enunciated in these cases. *Cottrell* is not a license to the district court and subsequent appellate panels to simply disregard the legal conclusions of the first appellate panel. According to *Cottrell,*

When a ... court has denied the qualified immunity defense prior to trial based upon its determination that the defense turns upon a genuine issue of material fact, the court should revisit *that factual issue* when, and if, the defendant files a timely Fed.R.Civ.P. 50(a) or (b) motion.

85 F.3d at 1488 (emphasis added). Thus, *Cottrell* does not stand for the proposition that the *Riley II* panel was free to revisit (or should have revisited) the legal conclusion that, under plaintiff's version of the facts as presented in the first appeal, defendant violated clearly established law. All *Riley II* could have revisited, according to *Cottrell,* is whether the trial bore out the plaintiff's version of the facts. If, as here, the facts as they emerged during the trial and as found by a jury are essentially the same as those alleged by the plaintiff in her first appeal, law of the case requires that the subsequent appellate panel adhere to the legal conclusion that the first panel reached—that is, the defendants are not entitled to qualified immunity. *See Riley II* (Kravitch, J., concurring in part, at 982) ("If, as here, the facts presented by the plaintiffs at the summary judgment stage become, without notable exception, the 'actual facts' as developed at trial, there is no need to revisit the qualified immunity determination made by the prior appellate panel.").

Significantly, as explained in *Cottrell,* the defendants here could have asked for special jury interrogatories designed to show that the plaintiff's version of the facts was incorrect. *See* 85 F.3d at 1487. Indeed, it would have been error for the district court to deny such a request. *Id.* at 1487–88. The court in this case did employ special interrogatories to resolve several important factual disputes (e.g., whether the defendants had received a court order before taking Rena into protective custody). The jury answered every one of these interrogatories in favor of the plaintiff. Importantly, the defendants did not object to the court's instructions or interrogatories. The defendants cannot now complain that these interrogatories were not artfully drawn or failed to answer the questions most relevant to the qualified immunity question. *Cf. Bendiburg v. Dempsey,* 19 F.3d 557, 562 (11th Cir.1994).

The *Riley II* panel's review of the facts leads to the conclusion that the jury ratified the plaintiff's version of the facts in its en-

---

**12.** I note that *Cottrell* was published after *Riley II* was decided. In any case, the result in *Riley* II is correct in light of *Cottrell* as well.

tirety. Under these conditions, the *Riley II* panel was bound by the *Riley I* panel's legal conclusion that the defendants are not entitled to qualified immunity. Neither *Cottrell* nor the exception to the law of the case doctrine applicable when "a subsequent trial produces substantially different evidence," *Robinson*, 690 F.2d at 872, justify a different result.

Judge Tjoflat further argues that law of the case does not apply to this case because the result works a "manifest injustice." *See Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir.1985).[13] In support of this assertion, he suggests, again, that the Constitution does not create the substantive rights claimed by the plaintiff and, even if it does, those rights were first recognized in *Riley II*; according to this logic, because the putative rights in question were not "clearly established" at the time the events giving rise to this action occurred, the defendants would be entitled to qualified immunity. Although Judge Tjoflat expends considerable verbiage to expose the manifest injustice that results from our adherence to law of the case doctrine, his argument, in my view, can be reduced to a straightforward critique of *Riley I* on the ground that it was wrongly decided. There is a peculiar circularity to this critique: The *Riley II* panel should not have applied law of the case to the decision in *Riley I* because that decision was wrong and the manifest injustice that results from adhering to *Riley I* is that the litigants are bound by a wrongly-decided decision! In the context of the applicability of the law of the case doctrine, however, "manifest injustice" does not

simply mean that a reasonable argument exists that the first panel's decision was wrong. Otherwise, the exception swallows the rule: If the doctrine of law of the case applies only where the second appellate panel believes that the first was absolutely correct, the doctrine means nothing. Indeed, as we previously have explained "the law of the case doctrine does not apply to bar reconsideration of an issue when ... the prior decision was clearly erroneous *and* would work manifest injustice." *Robinson*, 690 F.2d at 872 (emphasis added); *see also Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983); *Piambino*, 757 F.2d at 1120. Therefore, whatever "manifest injustice" means, it surely does not simply mean that the prior panel's decision was incorrect; rather, the doctrine stands for the proposition that, absent extraordinary circumstances, a panel of this court should adhere to a previous panel's decision in the same case *even if that decision is erroneous*. It was the unanimous view of the three judges who decided *Riley II* that extraordinary circumstances that would militate against applying law of the case did not exist here. That determination, although perhaps not to everyone's liking, is consistent with the jurisprudential ideal of finality, economy of judicial resources, and respect for prior appellate decisions that the law of the case doctrine embodies.

Surely, jurists could debate endlessly the legal connotations of the term "manifest injustice." That a Chief Judge of the United States District Court for the Northern Dis-

---

13. As noted, Judge Tjoflat also maintains that law of the case should not have been invoked in this instance because a contrary intervening legal authority—*McKinney v. Pate*—has eliminated the plaintiff's cause of action in its entirety. The basis for Judge Tjoflat's contention in this regard largely mirrors his castigation of the panel for its alleged creation of "new" substantive due process rights. It is abundantly clear that Judge Tjoflat and the panel disagree on this point. I will not reiterate my many reasons for disputing the wholesale applicability of *McKinney* to the constitutional claim at issue here. At the risk of incurring repetition, however, it is worth restating that *McKinney* was a case about state-created property rights. Significantly, although the dissent relies primarily on *Flint Elec. Membership Corp. v. Whitworth*, 68 F.3d 1309 (11th Cir.1995),

in support of the application of *McKinney* to all substantive due process claims, it is hardly a coincidence that the right asserted in *Whitworth* was solely a "state-created property right in ... electrical service contracts" and implicated a state law requiring governmental entities to engage in competitive bidding. *Id.* at 1313–14. Indeed, *Whitworth* expressly declares that the holding in *McKinney* was that " § 1983 substantive due process claims arising from nonlegislative deprivations of *state-created property interests* are no longer cognizable in this circuit." *Id.* at 1313 (emphasis added). The right at issue here, of course, is extraordinarily different from that invoked in cases such as *McKinney* and *Whitworth* and implicates a liberty interest far removed from either employment or contract bids.

trict of Georgia as well as two panels of this court all found no "injustice" in holding the defendants liable for their irresponsible abuse of state power is enough to convince me that no manifest injustice occurred in this case. Moreover, it is useful to remember here what the scope of our inquiry is at this stage of the litigation. Our task is to determine not whether the *Riley I* panel arguably reached the wrong conclusion but whether that panel's conclusion was so "clearly erroneous" (*and* results in such "manifest injustice") that we should not adhere to it. In light of the Supreme Court's long-term recognition of a fundamental right to family integrity, the *Riley I* panel's conclusion cannot be deemed *clearly* erroneous, if erroneous at all.

### CONCLUSION

Judge Tjoflat takes a remarkably different view of this case than did the district court judge, jury, and appellate court panels that have combed through the pleadings, testimony, and law relevant to this case. That is his prerogative. His negative appraisal of the panel's decision represents one voice in the ongoing dialogue about distinct interpretive perspectives in which we as jurists continually engage. That is as it should be. It is my view, however, that in his zeal to chastise the *Riley II* panel for what he denominates an "improper creation of new rights," dissent at 959, he has selectively ignored the unadorned facts that unfolded during the course of this litigation: The plaintiff's daughter, Rena, was taken into protective custody for reasons unrelated to her well-being and safety. Rena's boyfriend Billy, whose father was a county commissioner, exercised his considerable political influence to have Rena placed in non-approved homes where he could have access to her. Not surprisingly, Billy impregnated Rena (committing statutory rape in the process) and subsequently married her, thereby destroying the plaintiff's right to the custody and rearing of her minor child. Some of the mothers, fathers, grandmothers, and grandfathers on the jury evidently saw through the bureaucratic double-talk, used their common sense, and discerned just what had happened. The message the jury tried to send with its verdict is that busybodies in government can go too far and in this case they crossed the line. It seems to me—as it did to the panel in this case—that we should leave that jury determination alone and let the message sink in.